# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

CHRISTIAN DRIBUSCH and ELIZABETH DRIBUSCH, as legal guardians of CRAIG DRIBUSCH,

<em>Plaintiffs,</em>

-against-

WILLOW BAER, as Commissioner of the Office for People With Developmental Disabilities, in her official capacity,

<em>Defendant.</em>

**VERIFIED COMPLAINT**

Case No.: 1:25-CV-1721 (ECC/DJS)

Plaintiffs Christian Dribusch and Elizabeth Dribusch, as legal guardians of Craig Dribusch, respectfully allege as follows:

## INTRODUCTION

1.    New York's Office for People with Developmental Disabilities (OPWDD) has failed Craig Dribusch, a young adult with serious developmental disabilities.  In the face of repeated warnings from Craig's parents and expert clinicians that OPWDD lacked the capability to deal with Craig's extremely challenging behavioral problems, OPWDD demanded, on pain of funding-termination, Craig's transfer to OPWDD housing from the residential facility in Massachusetts where he had been thriving, the Judge Rotenberg Educational Center, Inc. (JRC).

2.    Exactly as predicted, OPWDD was utterly incapable of managing Craig's behaviors, and began resorting to using law enforcement and hospitalization to control him. Craig's condition deteriorated as he was subjected to repeated arrests, forced hospitalizations, and staff neglect and physical and psychological abuse.  By the end of his time in OPWDD housing,

1

staff were unable to care for him for even a single full day without resorting to police or hospitalization.

3.      In three short years under OPWDD's care, all of the dramatic improvements he had experienced at JRC — which had resulted in his lowest level of problematic behaviors since infancy — have been completely wiped out before regressing even further to the worst psychological and behavioral condition he has ever experienced.

4.      Craig has been left traumatized, filled with anxiety and panic that make him unable to enjoy normal life activities and unsafe in vital settings like around medical personnel. To make things worse, as a result of OPWDD's inability to manage his behaviors, Craig now faces multiple criminal charges — some pressed by the very OPWDD personnel who were tasked with protecting him.

5.      OPWDD's only proposed solutions are to either send Craig to a secured institution where he will be locked away from the community or to move him to another residential home of the same type as those that have failed him repeatedly over the past three years, but this time remote from his parents where they will be unable to observe the ongoing abuse and neglect and unable to intervene to protect him when OPWDD staff again abandon him to a hospital or the police.

6.      After three years, Craig should not have to continue enduring this mistreatment. Craig's parents should not be asked to believe that OPWDD will suddenly start keeping the promises they have been making since they first sought to return Craig to New York.

7.      OPWDD refuses to admit to its failures and refuses to even consider returning Craig to JRC, which was able to keep him safe and provide him a high quality of life in the community.

2

Since OPWDD refuses to do the right thing on its own, Craig's parents have no choice but to ask this Court to step in and force them to.

8.      Both the Rehabilitation Act and Title II of the ADA require the State to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities," and prohibit the unjustified isolation of individuals with disabilities.  By forcing Craig and his parents to choose between either a manifestly unsafe and inappropriate OPWDD residential home where he has been, and will continue to be, subject to abuse and neglect, arrests and criminal charges, and forced hospitalizations, or a locked, institutional setting where he will be a prisoner completely segregated from the community, OPWDD has violated and continues to violate Craig's federal statutory civil rights as well as his constitutional rights under the Equal Protection Clause and the Due Process Clause.

9.      Plaintiff seeks declaratory and injunctive relief requiring OPWDD to provide funding for Craig's return to JRC where he can receive clinically appropriate, safely staffed, and continuously supervised services commensurate with his needs.  Granting the relief requested herein is necessary because JRC is the one appropriate placement that will meet Craig's needs required by law, and Craig has the right to receive habilitation and care suited to his needs in the least restrictive setting.  Plaintiff also seeks attorneys' fees, costs, and any further relief the Court deems just and proper.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as Plaintiff's claims arise under the Fourteenth Amendment of the United States Constitution, the

Americans with Disabilities Act, and the Rehabilitation Act.  The declaratory relief that Plaintiff seeks is available under 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure 57.

11.    This Court has jurisdiction to order prospective relief in the form of a declaratory judgment and/or injunction against the Defendant Willow Baer, Commissioner of OPWDD, in her official capacity as an officer of the State of New York.

12.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 as this Court is sited in the judicial district where a substantial part of the events giving rise to Plaintiffs' claims have occurred, are now occurring, or will occur in the future. Plaintiffs' son Craig Dribusch resides in this district and is affected, and will continue to be affected, by the harms sought to be remedied in this action.

## PARTIES

### Plaintiffs

13.    Craig Dribusch is a 25-year-old resident of New York with severe developmental disorders, including autism spectrum disorder.  He is eligible to receive habilitation and other services and supports from OPWDD and has been receiving services and supports from OPWDD since he aged out of educational funding.

14.    Craig is an individual with disabilities within the meaning of federal law, including the ADA and Section 504.

15.    Plaintiff Christian Dribusch is an individual residing at 370 Kenwood Ave, Delmar, New York.  Christian Dribusch is Craig's father and in 2018 was appointed Craig's co-guardian by the Massachusetts Probate and Family Court.  On November 19, 2025, this guardianship was registered in New York.

16.     Plaintiff Elizabeth Dribusch is an individual residing at 370 Kenwood Ave, Delmar, New York.  Elizabeth Dribusch is Craig's mother and in 2018 was appointed Craig's co-guardian by the Massachusetts Probate and Family Court.  On November 19, 2025, this guardianship was registered in New York.

**Defendants**

17.     The New York State Office for People With Developmental Disabilities (OPWDD) is a New York State agency responsible for coordinating services for New Yorkers with developmental disabilities, including autism spectrum disorders.

18.     Willow Baer is the Commissioner of OPWDD.  She is sued in her official capacity.

## BACKGROUND

### Craig's Early Life

19.     Craig Dribusch was born on April 25, 2000.  At around one year of age, he began exhibiting serious self-injurious behavior, including head-banging.  At around 15 months of age, he experienced a major regression in speech, and his pediatrician referred him for early intervention.

20.     In February 2003, a developmental pediatrician diagnosed Craig with Pervasive Developmental Disorder-Not Otherwise Specified (PDD-NOS), which is now recognized as part of autism spectrum disorder.; despite speech, occupational, and physical therapies, he continued to engage in self-injurious behavior throughout early childhood.

21.     Craig attended an integrated preschool and later a self-contained kindergarten in the Bethlehem Central School District, yet required a one-to-one aide and a behavior support plan

due to persistent aggression, self-injury, verbal aggression, high anxiety, and low frustration tolerance.

22.     As academic demands increased, Craig's behavioral challenges escalated in middle and especially high school, including hitting, biting, head-banging, and self-biting. Craig's behavioral episodes can become violent and dangerous and have resulted in various injuries to himself and others, including caregivers attempting to restrain him.

23.     Various preventative strategies were attempted, but often failed due to spontaneous, rapidly intensifying outbursts. Craig's behaviors also began to include threats to engage in violent or terroristic activities. Inability to manage Craig's behavioral problems led the school district to attempt suspensions and ultimately to remove him from classroom settings in favor of one-to-one tutoring.

24.     Psychological evaluations documented Craig's increasing aggression, very uneven cognitive profile, impaired adaptive skills, and the link between academic stress, mood, and behavioral escalation.

25.     Numerous psychotropic medications were attempted without significant benefit, including amantadine, Thorazine, Depakote, Zoloft, Lexapro, Concerta, Ritalin, Daytrana, risperidone, Abilify, Zyprexa, Lithium, gabapentin, Buspar, Focalin CR, clonidine, Wellbutrin, and lorazepam.

26.     An attempted placement at the Questar III program failed because the program could not safely manage Craig's behaviors. Upon his return to his school district, he was placed in one-to-one tutoring without classroom reintegration. The loss of typical peers and cascading anxiety and depression contributed to further episodic aggression.

27. He subsequently transitioned to Wildwood in 2015, but the loss of typical peer supports, repeated suspension-related issues, and program changes exacerbated his anxiety, depression, and episodic aggression. At Wildwood, his behaviors were severe. There were 55 documented incidents of aggressive or self-injurious behavior from September 2015 to March 2016, with episodes averaging 71 minutes. Frequent physical restraints were required, and the school resorted to a timeout room despite this being contraindicated by other aspects of his diagnosis.

28. On November 4, 2016, Craig's school district formally recommended that his parents pursue a residential placement due to the severity of his behavioral challenges.

29. Beginning on November 28, 2016, Craig began a one-week in-patient stay at Four Winds Saratoga. His medications were adjusted, but without long-term benefit.

30. In December 2016, Craig's family and the district initiated a residential search; few New York facilities responded to the referral packet, and none had an available bed or accepted Craig, necessitating an out-of-state search.

31. Craig was no longer able to attend Wildwood due to the severity of his behaviors, and, starting in January 2017, his father Chris stayed home full time to care for him.

32. Craig's behaviors remained severe despite inpatient and outpatient psychiatric care, medication trials, and counseling attempts; he required at least five emergency-room visits, eloped once in May 2017, and on April 10, 2017, injured his mother during a behavioral episode requiring emergency care.

33. After touring programs in Massachusetts, New Hampshire, and Pennsylvania and reviewing others, Craig's parents determined that the Judge Rotenberg Educational Center (JRC)

in Massachusetts was the only appropriate facility within a reasonable distance that would allow them to stay connected through frequent visits.

34.     Craig left for JRC on July 11, 2017, after in-state educational and residential options had proven unable to safely manage his severe behaviors or accept him for placement.

## Craig's Dramatic Improvement at JRC

35.     JRC is a community-based residential program in Massachusetts for children and adults that specializes in treating severe behavior disorders with behavioral treatment.  It has an intensive behavioral treatment program developed and implemented by licensed Applied Behavior Analysis (ABA) practitioners and staff trained to manage severe aggression and self-injurious behavior.  ABA is the universally accepted standard of care for severe behavior disorders and is an evidence-based proven treatment.

36.     JRC's treatment program is licensed by the Massachusetts Department of Early Education and Care and the Massachusetts Department of Developmental Services and is approved by the New York State Education Department.

37.     JRC has a decades-long track record of achieving dramatic improvement in persons with even the most severe behavioral profiles and has a national reputation for its willingness to take on the most challenging individual who no other program will accept.  JRC currently serves school aged children and adults from over 30 states.

38.     Each year, JRC admits numerous school-aged children who could not be adequately served in any New York school, paid for by a combination of New York state and local funds.

39.     Upon admission to JRC, Craig had a documented history of aggressive, dangerous, destructive, disruptive, and noncompliant behaviors and diagnoses including autism spectrum

disorder, PDD-NOS, ADHD (combined type), mood disorder NOS, and anxiety; he arrived on prescriptions for amantadine and Thorazine, after numerous prior, unsuccessful psychotropic trials.

40.     Craig entered JRC's ABA program, which integrated behavioral counseling; self-monitoring and self-management; conditioned reinforcement via a token ("money") economy; differential reinforcement; behavior contracting with individualized schedules and reinforcers; extinction, blocking, and redirection strategies; and structured loss-of-privilege procedures with brief, calibrated delays to reinforcement. The program dynamically adjusted to Craig's response through more than 200 discrete treatment modifications over time, including changes to target behaviors, reinforcers, contract duration, residential and classroom assignments, and medication dosages.

41.     When safety required, JRC temporarily increased staffing ratios in Craig's residence and/or assigned him to alternative learning classrooms to stabilize behavior while maintaining programming; as his behavior improved, services were stepped down accordingly.

42.     As Craig's behavioral stability increased, JRC systematically tapered and ultimately eliminated his psychotropic medications while maintaining behavioral gains.

43.     During his JRC enrollment (2017–2022), Craig did not require hospital visits for behavioral or psychiatric reasons and had no contact with the criminal justice system; the frequency of emergency physical restraint declined over time.

44.     While at JRC, Craig resided in a suburban single-family home in the greater Boston area.

45.     Craig's progress enabled routine, successful community integration with peers and

staff, including trips to museums, zoos, parks, restaurants, recreational facilities, and other public venues, and facilitated regular family outings and home visits without hospital utilization or criminal-justice involvement.

46.    Educationally, Craig earned a New York State Regents Diploma, received an academic achievement award, and attended JRC's prom, reflecting sustained behavioral stability that allowed full participation in academic and social milestones.

47.    Craig had good relationships not only with his peers, but with JRC's staff, clinicians, and administration.

48.    Craig's behavior rates significantly declined across all tracked categories between his first and last 12 months at JRC. Monthly median events fell as follows: Aggression from 107 to 21; Health-Dangerous Behavior from 73.5 to 12.5; Destruction from 5 to 1; Major Disruption from 62.5 to 38; and Noncompliance from 35.5 to 8.5. These data place his fall 2022 behavior rates at the lowest levels of his JRC enrollment and perhaps of his entire life since infancy.

49.    By September 29, 2022, Craig was functioning at his best-documented levels within a 24-hour, intensively-managed ABA program that his treatment team and parents considered necessary to maintain his gains.

**Craig's Compelled Return to New York**

50.    In April 2021, Craig turned 21 years old, and under New York law that meant that he would age out of educational funding at the conclusion of the school year.  At that time, OPWDD would become responsible for funding his placement and services.

51.    When out-of-state students at JRC age out of educational funding, JRC clinicians work collaboratively with guardians and the relevant home-state agencies to help identify an

appropriate adult placement and ensure a smooth transition back to the home state.  In a small minority of cases — typically those individuals with the most severe behavioral profiles — when JRC's clinicians do not believe the home state is capable of providing a safe and appropriate placement, JRC will recommend that the individual transition into JRC's adult services.

52.     OPWDD has the authority to continue funding an out-of-state residential placement indefinitely.  Although most New York students at JRC return to New York after they age out, there are currently dozens of New York State adults residing at JRC under OPWDD funding after aging out of educational funding, some of whom have been there for more than a decade since aging out.

53.     Beginning no later than September 2020, OPWDD began communicating with Craig's parents about placement options for Craig after he aged out of educational funding.

54.     On September 8, 2020, Craig's parents participated in an OPWDD Residential Opportunities Committee (ROC) meeting via Webex to introduce Craig to potential residential provider agencies and to learn about New York placements that OPWDD might pursue for him.

55.     Through 2020 and 2021, Craig's parents engaged in a sustained cadence of planning meetings and screening calls with OPWDD personnel and provider agencies, including: October 12, 2020 (with OPWDD's Jackie A. and Noreen Gill); November 6, 2020 (AIM Services screening); November 20, 2020 and December 18, 2020 (post–high school planning calls); January 15, 2021 (post–high school planning); January 20, 2021 (Central NY ROC); February 17, 2021 (AIM Services intake screening via Zoom); March 26, 2021 and April 23, 2021 (post–high school planning); May 21, 2021 (post–high school planning); June 1, 2021 (screening set up by OPWDD's John Drake); June 30, 2021 (OPWDD Comprehensive Assessment System/CAS

meeting, 1–4 p.m.); August 2, 2021 (OPWDD meeting regarding Craig's needs, including behavioral needs); August 30, 2021 (coordination meeting); October 11, 2021 (OPWDD conference call); and additional JRC-led goal-setting on April 27, 2021.

56.    For the monthly meetings through June 2021, OPWDD, the Bethlehem Central School District, and JRC all participated, providing a regular forum in which Craig's parents reiterated his significant behavioral risks — including aggression, hitting, and biting — and voiced concern that OPWDD's system lacked the clinical depth and staffing to keep him safe if returned to New York.

57.    Craig's parents consistently warned OPWDD that any New York program would need 24-hour, highly trained staff with experience managing severe, dangerous behaviors and rapid-access backup; JRC reinforced those concerns during the multi-party meetings.

58.    OPWDD organized and facilitated multiple provider screens and assessments intended to pave the way for Craig's eventual return to New York, including AIM Services screenings (November 6, 2020; February 17, 2021) and a June 1, 2021 screening coordinated by OPWDD's John Drake.

59.    In parallel, OPWDD undertook a Comprehensive Assessment System (CAS) evaluation on June 30, 2021 to conduct a full assessment of Craig's needs, including his behavioral needs, in anticipation of an in-state placement.

60.    OPWDD arranged site activities, including a June 29, 2021 visit to a proposed residence and a December 10, 2021 residence visit, as part of the transition planning.

61.    Notwithstanding this activity, AIM Services and the Center for Disability Services screened Craig and declined to offer services due to his behavioral profile; a third agency also

screened Craig and offered nothing, reinforcing the parents' concern that OPWDD's provider network lacked the capability to serve him safely.

62.    Throughout these discussions, OPWDD were adamant that under no circumstances would they consider allowing Craig to remain at JRC, even though numerous other New York residents in the same circumstances had been allowed to do so under OPWDD funding.

63.    OPWDD eventually proposed a residential placement in Niskayuna, New York.  In response to parental and JRC warnings, OPWDD repeatedly assured the family that New York programs had well-trained professional staff and that, if needed, personnel could be surged from nearby OPWDD houses or from the O.D. Heck Developmental Center due to its geographic proximity, thereby providing the necessary depth during behavioral episodes.

64.    Despite repeated parent requests, OPWDD did not allow Craig's parents to meet or speak with prospective direct care staff before a placement decision, restricting access until after a placement was accepted and thereby limiting the family's ability to vet how staff would approach Craig's known behavior profile.

65.    OPWDD conveyed most of its assurances and representations by phone during conference calls and put very little in writing; upon information and belief, OPWDD avoided memorializing key promises in writing.

66.    After the family engaged legal counsel, OPWDD's pattern of regular direct meetings with the parents ceased, and OPWDD reduced its direct engagement with the family, even as the transition planning to return Craig to New York continued.

67.    The cumulative effect of these communications was to advance and finalize OPWDD's plan to transition Craig from JRC back to an OPWDD-operated or -contracted

residence in New York, despite repeated warnings from his parents and JRC about the severity of his behavioral risks and the need for specialized, highly structured supports.

68.    During one phone call with OPWDD officials, Craig's parents expressly described their fear:  OPWDD staff would be unable to manage Craig's behaviors or handle him when he had a severe aggressive episode, so they would resort to calling the police; Craig would then end up enmeshed in the criminal justice system; this would then serve as a justification to transfer Craig to an institutional placement.  OPWDD staff dismissed these concerns as overwrought and insisted that OPWDD had no intention of allowing anything like that to happen.

69.    Despite their skepticism of OPWDD's promises, Craig's parents believed that an administrative challenge to the proposed placement would be futile because OPWDD's representations about the training and experience of its staff would make the placement look appropriate on paper.

70.    Refusing the offered placement would result in the discontinuation of Craig's funding at JRC, which Craig's parents could not afford to pay for on their own.

71.    They opted instead to try to work collaboratively with OPWDD to obtain the most appropriate placement and services that they could get for Craig.

**Craig's Deterioration Under OPWDD Care**

72.    On September 29, 2022, Craig was discharged from JRC to the care of OPWDD in a residential placement in Niskayuna.

73.    Immediately following OPWDD's assumption of care, Craig's condition deteriorated, with recurrent episodes of physical aggression, self-injury, and threats of self-harm resulting in repeated emergency-room visits at Ellis Hospital beginning on October 11, 2022 and

14

continuing through 2023–2025.

74.    In 2023 alone, Craig required multiple ER visits for physical aggression and self-injury on February 16–17, April 13–14, May 17–19, July 20, and October 3–4, including head injuries with bifrontal scalp hematomas.

75.    In June 2023, an Extreme Risk Protection Order (ERPO) was sought after Craig made threats in the presence of police, further evidencing the crisis following OPWDD's assumption of care.

76.    Due to their inability to handle Craig, OPWDD staff began resorting to calling the police when he had a behavioral episode.  Police would usually just transport Craig to a hospital where he would be evaluated and then returned to his OPWDD residence.  But beginning in 2023, Craig began to accrue criminal charges: on August 24, 2023, he was arrested for harassment in the second degree and forcible touching; on December 12, 2023, he was arrested again for second-degree harassment.  These charges were pressed by OPWDD staff, the very people who were supposed to be helping to manage his aggressive episodes.

77.    On May 14, 2024, Craig was physically abused by OPWDD staff; a New York Justice Center investigation substantiated some allegations, including that Craig was kicked and hit in the head, chest, and back, after which he required urgent and emergency care for a sprained right thumb and a ruptured eardrum.

78.    In the aftermath of this abuse, Craig's parents learned that most of the staff supervising Craig were out of compliance with their PROMOTE training — the protocol OPWDD uses for physical interventions.  It took months for OPWDD to correct this deficiency.

79.    Through mid-to-late 2024, Craig's ER utilization continued to climb and included

inpatient behavioral admission on July 9–10, ER visits on August 8, 13–14, and 28 (with four-point restraints), further urgent care visits for injuries, a diagnosis of a fractured wrist on August 31, and surgery for a left scaphoid fracture with open reduction and internal fixation on September 26; in October 2024, he was arrested for pulling a fire alarm without good cause.

80.     In 2025, Craig's deterioration persisted with ER visits with repeated use of four-point restraints on January 5, January 10, and February 15–17, among other dates, for suicidal and homicidal ideation, ingestion of hazardous substances, violent behavioral episodes including biting, and repeated head injuries requiring CT imaging.

81.     On April 24, 2025, Craig was arrested for assault in the third degree; on May 2–3, 2025, he required ER care after terroristic and homicidal threats during a behavioral crisis in which hospital restraints and Haldol were administered.

82.     On June 13, 2025, the Supreme Court, Schenectady County, issued an Extreme Risk Protection Order.  Craig's parents did not even learn about the hearing until July 2, when they read it in Craig's care manager's notes for a clinical meeting.

83.     Additional ER and urgent care encounters followed in June and July for head injuries and other trauma.

84.     On August 10–11, 2025, Craig told staff he did not want to return to his OPWDD group home because staff had locked him in his closet.  Craig was seen at Albany Medical Center after he attempted to jump out of his parents' moving vehicle to avoid returning to the group home and was then transported by his parents to Ellis Hospital for crisis care when his behavioral crisis continued after leaving Albany Medical Center.

85.     On September 28, 2025, Craig eloped from the OPWDD residence naked after a

known door-lock malfunction, sustaining a head injury; EMS documentation recorded him in the middle of a five-lane highway (Troy–Schenectady highway), and he was subsequently arrested and charged with felony assault in the second degree for biting a police officer and harassment in the second degree.

86.    In October 2025, Craig's crisis continued: repeated ER visits for head injuries; an altercation at Albany Medical Center on October 15 during which he was restrained and injured; an ankle sprain diagnosed the next day; and, on October 22, 2025, a court-issued order of protection requiring Craig to stay away from his OPWDD residence, which left OPWDD without an appropriate placement and led to periods where his parents had to house and supervise him without consistent 24-hour OPWDD support because Craig was terrified of OPWDD staff.

87.    Throughout this entire time period, every single one of these incidents, including the elopements, the unexplained injuries, and all of the behavioral escalations, occurred while Craig was supposed to be under direct one-on-one supervision.

88.    On October 25, 2025, OPWDD provided a new residence for Craig at a Comprehensive Adult Transitional Home ("CATH") in Clifton Park.  CATH houses are intended as temporary placement with more robust therapeutic supports before transitioning to a new permanent home.

89.    On October 28, 2025, Craig experienced escalating behavioral crises at OPWDD's CATH residence and day program.  Police were called after he attacked a nurse and firefighters before escaping from his day program.  He was transported to Albany Med and then discharged to the CATH house.  Almost immediately he became aggressive, and CATH OPWDD staff called the police who brought him to Ellis Hospital. Less than an hour later he was discharged back to

17

the CATH house.

90.    The following day, October 29, 2025, Craig attacked a nurse at the CATH house. Police were called, and Craig attacked a police officer.  Craig was then transported to Saratoga Hospital.  Craig's parents were informed by Saratoga Hospital that OPWDD staff refused to sit with Craig or supervise him at the hospital.

91.    After discharge from the hospital after midnight, on October 30, 2025, Craig was taken by police from the hospital to the police station where he was charged with criminal mischief. After engaging in further dangerous behavior, he was returned to the hospital.

92.    At 11 AM, he was discharged from the hospital back to the police station where he damaged property and was again charged with felony criminal mischief.  Craig's parents arrived at the police station at 12 PM.  Craig's parents needed staff assistance to transport Craig back to the residence, but OPWDD staff did not arrive until four hours later.  Due to his overwhelming fear of OPWDD staff, Craig refused to go with them alone, so Craig's parents followed the OPWDD vehicle back to the residence.  Additional criminal charges for assault and harassment were filed by the Town of Clifton Park.

93.    Beginning on October 30, 2025, Craig's parents began taking turns staying with Craig at the CATH house 24/7 to keep him safe and calm.

94.    On November 3, 2025, OPWDD staff instructed Craig's parents to "back off" and let them do their jobs.  Craig's parents did so, and almost immediately Craig's behaviors escalated and staff responded by calling the police.  State police arrived but did not arrest Craig.  During Craig's behavioral escalation, one or more OPWDD staff hid in the basement rather than help manage him.  One staff member attempted to break Craig's arm by closing a door on it and then

18

locked Craig alone in the garage. Other OPWDD staff who reviewed the incident report filed a complaint with the Justice Center.

95.    In the span of less than a week Craig had more than half a dozen police encounters, two arrests, at least four hospitalizations, new criminal charges brought by both the Saratoga County Sheriff's Office and the Town of Clifton Park, including a felony, and an episode of severe physical abuse by OPWDD staff. He had also faced multiple instances of staff neglect, mismedication, and abandonment.

96.    On November 4, 2025, Craig's parents brought him home. They could not in good conscience allow him to remain in that hostile, abusive, and demonstrably unsafe environment.

97.    OPWDD subsequently packed up all of Craig's belongings and removed them from his room in the CATH house.

98.    Less than three weeks after Craig's disastrous final week at the Clifton Park CATH house, OPWDD held a public ribbon cutting ceremony to celebrate its grand opening.

99.    Since November 4, 2025, Craig has been at home with his parents where they have had to stay with him 24 hours a day.

100.    When Craig is calm and under control, his parents have taken him on outings into the community, but Craig has continued to have cycles of escalating behavior at home culminating in severe aggressive outbursts.

101.    To date, his parents have managed to keep Craig safe without resorting to the police or hospitalization, but it has taken a serious physical toll on Chris Dribusch, including injuries sustained restraining Craig during violent episodes.

102.    Craig's parents cannot keep him safe by themselves much longer, but their only

19

viable alternative is to return him to OPWDD's care, where it is a near certainty that he will almost immediately be hospitalized or arrested as a result of the staff's inability to manage him.

103.    As a result of his arrests under OPWDD's care, Craig still has pending criminal charges in both Albany and Saratoga County.

104.    All of the behaviors Craig has exhibited since his return to New York were extensively documented since adolescence, if not earlier. OPWDD was repeatedly warned by both Craig's parents and his clinicians at JRC about the nature of Craig's self-injurious and aggressive behaviors, including very specific issues like threats and attempted elopement, about the severity and intensity of Craig's behaviors, and about the intensive measures necessary to reduce Craig's dangerous behaviors and to control Craig in the midst of a behavioral episode. Despite this, OPWDD's staff have proved manifestly unprepared and unqualified to properly care for Craig.

105.    Although all of Craig's behaviors were well-known and flow directly from his disabilities, none of the severe outcomes Craig has experienced under OPWDD's care is an inevitable result of his condition. JRC was able to care for Craig for five years without ever resorting to police or hospitalization as a means of behavior control. Craig was able to achieve a high quality of life in a community setting with friendships and healthy social interaction without the fear of arrests and criminal charges.

## The Effects on Craig

106.    As a consequence of repeated police-involved crises under OPWDD care, Craig developed a pronounced, new fear response to law enforcement; when he sees a police officer or vehicle, he visibly tenses and keeps watch.

107.    To avoid triggering that fear, Craig's family now alters routine community

activities — for example, when walking to the local library they enter via the Delaware Avenue entrance to avoid passing the nearby police station.

108.    Craig persistently verbalizes fears that he will be arrested and jailed if he goes out, sometimes blurting out these statements mid-activity when the fear intrudes on his thoughts; he also now shows fear in busy public settings, which he did not display before OPWDD's involvement.

109.    Craig has also developed fear of OPWDD staff; during his stay at the CATH house he repeatedly asked staff, "Are you going to hurt me?," reflecting a loss of basic trust in his caregivers' ability to keep him safe during escalations.

110.    By contrast, before OPWDD assumed care, Craig had participated in hundreds of restraints without exhibiting post-restraint fear or distress and without fearing intentional harm or harm from improper implementation of interventions, demonstrating a material, negative change attributable to his OPWDD experience.

111.    Although Craig previously had positive relationships with some caregivers, those relationships have been overwhelmed by the cumulative negative experiences he has endured under OPWDD care.

112.    Craig has become fearful of hospitals and has been placed in four-point restraints multiple times during emergency department encounters arising from OPWDD-managed crises, reinforcing his trauma and avoidance.

113.    Under OPWDD's care, Craig has also suffered multiple instances of undiagnosed injury.  On one occasion when he was hospitalized without OPWDD staff present, he was discharged with an undiagnosed sprained ankle, requiring his parents to seek subsequent treatment.

On another occasion, he suffered a wrist fracture from an unknown cause and, because it was left undiagnosed for an extended period of time, required an invasive surgery to repair. These episodes have further eroded Craig's trust in hospital settings.

114.    Craig's fear of hospitals now impedes timely access to medical care during behavioral episodes; his escalating behaviors in the emergency department reflect a "fight or flight" response driven by that fear, compounding clinical risks during crises.

115.    The combined effects of staff's inability to manage known behaviors, repeated police and hospital involvement, and criminalization have left Craig anxious and hypervigilant, with intrusive fears that disrupt everyday activities and community participation.

116.    These harms are ongoing and self-reinforcing: fear of staff and hospitals increases crisis severity, which in turn heightens the likelihood of police involvement and restraint, further entrenching Craig's trauma response.

117.    Perhaps worst of all, his time under OPWDD's care has erased all of the progress he achieved during his time at JRC. Instead of the record low levels across all categories of problematic behaviors, Craig now has a behavior profile worse than when his condition first necessitated enrollment at JRC.

118.    On top of this, Craig now suffers from a level of debilitating anxiety, fear, and distrust of all manner of authority figures and caretakers that was minimal or nonexistent prior to his return to New York.

119.    Finally, Craig is still facing felony criminal charges in two counties. His criminal defense attorney is trying to resolve these without serious lifelong consequences, but each additional arrest and charge has made this more difficult and increased the chances of a seriously

adverse outcome, including the possibility of civil commitment. Due to Craig's current fragile state, each mandatory court appearance creates a risk of another dangerous episode.

### OPWDD's Proposed Solutions

120.    During OPWDD's discussions with Craig's parents prior to his transfer to New York from JRC, Craig's parents were concerned that OPWDD would attempt to place Craig at Sunmount Developmental Center in Tupper Lake. Sunmount, along with Valley Ridge in Norwich, are OPWDD's two highest security institutional facilities.

121.    Sunmount's secure units are surrounded by high inward-facing fences topped with razor wire to prevent escape. Its small population includes persons charged with murder and other serious violent crimes but found incompetent to stand trial.

122.    Craig's parents were adamant that Craig — who had been safely and successfully living in housing in the community for years at JRC — did not belong in a confined institutional setting like Sunmount. OPWDD staff agreed that Sunmount was not an appropriate placement.

123.    While Craig was living in the OPWDD residential home in Niskayuna, certain staff, unable to properly manage Craig's behavioral escalation, attempted to manage Craig through fear by threatening that if he did not behave he would be sent to Sunmount.

124.    As a result, Craig developed a deep fear that he would be sent away to Sunmount, which led to intrusive thoughts and hyperfixation that exacerbated his behavioral cycles.

125.    Craig's parents repeatedly asked OPWDD administration to stop staff from invoking Sunmount as a threat because of the terrible psychological effect it was having on Craig, but these threats continued for years. During that time Craig's parents were assured by OPWDD that Sunmount was not an appropriate placement.

126.    When the protective order was issued barring Craig from his Niskayuna residence, OPWDD proposed Sunmount as a solution, despite their years of prior assurances that this was not an appropriate placement for Craig.  Craig's parents were again adamant that Sunmount was inappropriate, but OPWDD went forward and sought, and received, approval from its Statewide Advisory Committee to place Craig in Sunmount or Valley Ridge.

127.    On November 14, 2025, OPWDD's Chief Psychologist emailed Craig's parents, seeking to schedule a suitability review to assess Craig for placement in an Intensive Treatment Opportunity (ITO).  OPWDD's two ITO programs operate at Sunmount and Valley Ridge.  The email indicated that Craig's parents would be prohibited from attending the suitability review and that one of the purposes of the suitability review would be to try to obtain Craig's voluntary consent to institutionalization in an ITO.

128.    OPWDD was aware that Craig had a debilitating fear of being institutionalized, yet they sought to schedule a one-on-one meeting without the presence of his parents for the express purpose of obtaining his consent to institutionalization.

129.    Moments after sending this email, the same Chief Psychologist sent an internal email, with instructions not to forward, explaining that because Craig's parents had not had their Massachusetts guardianship recognized by a New York court, OPWDD would not recognize them as his guardians.  This email was inadvertently forwarded to Craig's parents by one of the recipients who subsequently attempted unsuccessfully to recall it.

130.    At this point, OPWDD had been dealing with Craig's parents as his guardians for over three years after Craig's return to New York, including, for example, seeking their approval for medication changes.  At no time during those three years did OPWDD ever mention the need

to have their Massachusetts guardianship order recognized in New York.

131.    Upon learning of this, Craig's parents immediately began the process of getting their guardianship recognized in New York, which they completed on November 19, 2025.

132.    On or about November 17, 2025, Craig's parents were informed by OPWDD that Craig was being recommended for placement at Valley Ridge, the other ITO, instead of Sunmount.

133.    Valley Ridge is substantially similar to Sunmount, but it does not have the same notoriety that Sunmount developed after high profile newspaper exposés and state investigations of its conditions.  It serves the same population as Sunmount and is surrounded by a 14-foot-high curved fence topped with razor wire.

134.    Other than these ITOs, the only options that OPWDD has presented to Craig's parents are two other CATH placements, each significantly more distant from their home than the Clifton Park CATH house.  Craig's parents have not received a formal proposal or details about either of these options.

135.    OPWDD has claimed that these CATH houses have more experienced and qualified staff — the same claims they made to induce Craig's parents to agree to his transfer to New York in the first place.  Craig's stay at the Clifton Park CATH house was disastrous, and there is no basis to believe these other locations will be different — just farther from his parents.

136.    CATH houses are only intended for short-term housing of less than 18-months, so even if it were appropriate for Craig, another CATH placement would only be a temporary solution.  After that transitional time period, if Craig cannot be safely housed in a residential setting — and OPWDD has provided no reason to believe that they can do so after their failure in Niskayuna — OPWDD's only viable option would be institutionalization.

25

137. Although JRC stands ready and willing to take Craig back on short notice, OPWDD steadfastly refuses to even discuss this as a possibility. Craig has been asking to be returned to JRC since shortly after he came back to New York.

**CLAIMS FOR RELIEF**

**FIRST CLAIM FOR RELIEF:**

**(Discrimination in Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et. seq.*)**

138. Plaintiffs repeat and reallege each and every allegation heretofore set forth in this Complaint.

139. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

140. Title II and its implementing regulations prohibit the "unjustified isolation" of individuals with physical and intellectual disabilities, 42 U.S.C. §§ 12102(1)(A) & 12132; *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597 (1999), and require the State to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

141. Title II and its implementing regulations prohibit a public entity from, on the basis of disability, " limit[ing] a qualified individual with a disability in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving the aid, benefit, or service." 28

C.F.R. § 35.130(b)(1)(vii).

142.    Title II and its implementing regulations prohibit a public entity from "utiliz[ing] criteria or methods of administration . . . [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3).

143.    OPWDD is a "public entity" subject to Title II. 42 U.S.C. § 12131(1).

144.    By reason of his behavioral disability and Autism, Craig is a "qualified individual with a disability" within the meaning of Title II. 28 U.S.C. § 12131(2).

145.    Defendant has forced Craig and his parents to choose between a highly restrictive institutional placement and a residential setting which has proven to be manifestly unsafe, resulting in repeated episodes of serious injury, abuse, neglect, unnecessary hospitalizations, and arrests resulting in criminal charges.

146.    Craig could live successfully in a community setting if appropriate supports and services were made available.

147.    Craig has been determined by health care professionals to be appropriate for community placement.

148.    Defendant can reasonably accommodate Craig's placement at JRC without making fundamental alterations to OPWDD's services. OPWDD currently funds numerous adults at JRC.

149.    By failing to provide Craig with an adequate placement and ignoring their statutory obligations for over three years, failing and refusing to place Craig at JRC, refusing to fund Craig's placement at JRC, and failing to provide Craig appropriate treatment for his disabilities, Defendant has:

(a)    discriminated against Craig;

(b)    excluded Craig from participation in, and denied him the benefits of, the services, programs and/or activities of OPWDD;

(c)    failed to administer services to Craig in the most integrated setting appropriate to his needs; and

(d)    limited Craig in the enjoyment of rights, and opportunities enjoyed by other New York residents who are qualified individuals with disabilities receiving aid, benefits, or services from OPWDD.

150.    Such discrimination, exclusion and denial were by reason of Craig's disability, in violation of Title II and its implementing regulations.

151.    As the direct and proximate result of Defendant's violations of Title II, Craig has suffered severe and substantial damages and is entitled to injunctive and declaratory relief and an award of costs and reasonable attorneys' fees.

## SECOND CLAIM FOR RELIEF:

**(Discrimination in Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794)**

152.    Plaintiffs repeat and reallege each and every allegation heretofore set forth in this Complaint.

153.    Section 504 provides that "[n]o otherwise qualified individual with a disability in the United States… shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…." 29 U.S.C. § 794.

154.    Section 504 and its implementing regulations require that recipients of Federal financial assistance provide services and supports in the most integrated setting appropriate to the needs of individuals with disabilities. 29 U.S.C. § 794; 45 C.F.R. § 84.4.

155.    At all times relevant to this action, OPWDD has been a recipient of Federal financial assistance, including Medicaid funds, and are therefore subject to Section 504 and its implementing regulations.

156.    By reason of his behavioral disability and Autism, Craig is a "qualified individual with a disability" within the meaning of Section 504. 28 U.S.C. § 705(20).

157.    Defendant has forced Craig and his parents to choose between a highly restrictive institutional placement and a residential setting which has proven to be manifestly unsafe, resulting in repeated episodes of serious injury, abuse, neglect, unnecessary hospitalizations, and arrests resulting in criminal charges.

158.    Craig could live successfully in a community setting if appropriate supports and services were made available.

159.    Craig has been determined by health care professionals to be appropriate for community placement.

160.    Defendant can reasonably accommodate Craig's placement at JRC without making fundamental alterations to OPWDD's services. OPWDD currently funds numerous adults at JRC.

161.    By failing to provide Craig with an adequate placement and ignoring their statutory obligations for over three years, failing and refusing to place Craig at JRC, refusing to fund Craig's placement at JRC, and failing to provide Craig appropriate treatment for his disabilities, Defendant has:

(a)    discriminated against Craig;

(b)    excluded Craig from participation in, and denied him the benefits of, the services, programs and/or activities of OPWDD;

(c)    failed to administer services to Craig in the most integrated setting appropriate to his needs; and

(d)    limited Craig in the enjoyment of rights, and opportunities enjoyed by other New York residents who are qualified individuals with disabilities receiving aid, benefits, or services from OPWDD.

162.    Such discrimination, exclusion and denial were by reason of Craig's disability, in violation of Section 504 and its implementing regulations.

163.    As the direct and proximate result of Defendant's violations of the Section 504, Craig has suffered severe and substantial damages and is entitled to injunctive and declaratory relief and an award of costs and reasonable attorneys' fees.

## THIRD CLAIM FOR RELIEF:

**(Violation of 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution)**

164.    Plaintiffs repeat and reallege each and every allegation heretofore set forth in this Complaint.

165.    Under Section 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws, shall be liable to the party injured in an action at law[.]"

166.     The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution ("Equal Protection Clause") states that "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV.

167.     The Equal Protection Clause prohibits Defendant from denying New York residents equal protection of the laws.

168.     New York residents with developmental disabilities receive State-funded habilitation and services in community-based residential placements both within New York and in out-of-state placements suited to their needs in the least restrictive and most normal living conditions possible.

169.     OPWDD has treated Craig differently than similarly situated New York residents with developmental disabilities who receive habilitation and services in community-based residential placements both within New York and in out-of-state placements suited to their needs in the least restrictive and most normal living conditions possible.  OPWDD has: failed to provide Craig with an adequate community-based residential placement and violated its statutory obligations for over three years; failed and refused to place Craig at JRC; refused to fund Craig's placement at JRC; and failed to provide Craig habilitation and treatment for his disabilities suited to his needs in the least restrictive and most normal living conditions possible.

170.     Defendant's violations of Craig's constitutional rights were caused by, among other things, the OPWDD Policies, upon which OPWDD relied and which OPWDD claims prohibit OPWDD from placing Craig at JRC.

171.     The OPWDD Policies do not provide a rational basis for this disparate treatment of

Craig. As such, OPWDD has violated Craig's constitutionally protected equal protection rights.

172.    As a direct and proximate result of the OPWDD Policies and violation of Craig's constitutional rights as described above, Craig has suffered severe and substantial damages and is entitled to injunctive and declaratory relief and an award of costs and reasonable attorneys' fees.

## FOURTH CLAIM FOR RELIEF:

**(Violation of 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment of the United States Constitution)**

173.    Plaintiffs repeat and reallege each and every allegation heretofore set forth in this Complaint.

174.    Under Section 1983, "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law[.]"

175.    The Due Process Clause of the Fourteenth Amendment states that "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV.

176.    Defendant has violated Craig's liberty rights as secured under the Due Process Clause and Section 1983. Defendant has: failed to provide Craig with an adequate placement and violated its statutory obligations for over three years; failed and refused to place Craig at JRC; refused to fund Craig's placement at JRC; and failed to provide Craig habilitation and treatment

32

for his disabilities suited to his needs in the least restrictive and most normal living conditions possible.

177.    Defendant's violations of Craig's constitutional rights were caused by, among other things, the OPWDD Policies, upon which OPWDD relied and which OPWDD claims prohibited OPWDD from placing Craig at JRC.

178.    As a direct and proximate result of the OPWDD Policies and violation of Craig's constitutional rights as described above, Craig has suffered severe and substantial damages and is entitled to injunctive and declaratory relief and an award of costs and reasonable attorneys' fees.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Christian Dribusch and Elizabeth Dribusch, as legal guardians of Craig Dribusch, respectfully request that this Court grant the following relief:

1. Grant judgment in favor of Plaintiffs on their Complaint and declare that Defendant has violated the rights of Craig Dribusch under the anti-discrimination provisions of Title II of the ADA (42 U.S.C. § 12132), and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794);

2. Declare that Defendant has violated Craig's equal protection rights as secured under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

3. Declare that Defendant has violated Craig's substantive due process rights as secured under the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983;

4. Enter a preliminary injunction: (1) enjoining Defendant for the pendency of this action from continuing to violate Title II of the ADA (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and 42 U.S.C. § 1983 with regard to the care and

purported treatment of Craig; (2) ordering Defendant to immediately provide Craig the appropriate treatment and habilitation to which he is entitled pursuant to law; and (3) ordering Defendant to coordinate the transfer of Craig to JRC, and fund his treatment and habilitation at JRC, the only appropriate treatment facility willing to accept Craig;

6. Enter a permanent injunction: (1) enjoining Defendant from violating Title II of the ADA (42 U.S.C. § 12132), Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), and 42 U.S.C. § 1983 with regard to the care and purported treatment of Craig; (2) ordering Defendant to provide Craig the appropriate treatment and habilitation to which he is entitled pursuant to law; and (3) ordering Defendant to transfer to and fund Craig's placement at JRC, the only appropriate treatment facility willing to accept Craig, until another placement can be found that is demonstrably appropriate to meet all of Craig's needs;

7. Grant Plaintiffs their reasonable attorneys' fees, litigation expenses, and costs; and

8. Grant Plaintiffs such further relief as this Court deems equitable and proper.


DATED:        December 9, 2025                    O'CONNELL AND ARONOWITZ


                                        By:    *s/Jeffrey J. Sherrin*
                                               Jeffrey J. Sherrin, Esq.
                                               Bar Roll No. 102601
                                               Michael Y. Hawrylchak, Esq.
                                               Bar Roll No. 518393
                                               *Attorney for Plaintiffs*
                                               54 State Street, 9th Floor
                                               Albany, NY 12207
                                               (518) 462-5601
                                               jsherrin@oalaw.com
                                               mhawrylchak@oalaw.com

**VERIFICATION**

I, Elizabeth Dr. Musk, declare as follows:

1.      I have read the foregoing Verified Complaint in this proceeding and have personal

knowledge of the facts related therein and, pursuant to 18 U.S.C. § 1746, I hereby verify under

penalty of perjury that the facts stated in the Complaint are true and correct.

Executed on ___December 9___, 2025.


_____
[Name]

33

4922-9824-7801, v. 3