UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

———————————————————————

CHRISTIAN DRIBUSCH and ELIZABETH
DRIBUSCH, as legal guardians of
C.G.,[1]

                        Plaintiffs,                    1:25-cv-1721
                                                       (ECC/PJE)
v.

WILLOW BAER, as Commissioner of the Office
for People with Developmental Disabilities, in
her official capacity,

                        Defendant.

———————————————————————

Michael W. Hawrylchak, *for Plaintiffs*
Elizabeth Lombardi, Asst. Att'y General, *for Defendant*

**Hon. Elizabeth C. Coombe, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiffs Christian and Elizabeth Dribusch bring this action on behalf of their son, C.G., a

twenty-five-year-old individual who suffers from severe developmental disorders.  *See generally*

Dkt. No. 1.  The Complaint alleges violations of Title II of the Americans with Disabilities Act,

42 U.S.C. §§ 12131, et seq.; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and

42 U.S.C. § 1983, in conjunction with the Office for People with Developmental Disabilities'

---

[1] Generally, the title of the complaint must name all the parties. Fed. R. Civ. P. 10.  However, there are circumstances where the public's interest in disclosure is outweighed by substantial individual privacy concerns. *See, e.g., Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185 (2d Cir. 2008). At this juncture, and in the absence of any immediate request by the Plaintiffs, the Court has sua sponte determined to refer to Plaintiff by his initials due to the sensitive medical information discussed in this decision, as well as the emergent nature of the pending motion. *See generally* NDNY LR 5.2(a).  This issue can be revisited, if appropriate, before the assigned magistrate judge.

(OPWDD) provision of benefits and services to C.D. *Id.* at ¶¶ 138-78. Plaintiffs seek declaratory and injunctive relief. *Id.* at 33-34.

Presently before the Court is Plaintiffs' motion for a temporary restraining order and preliminary injunctive relief under Rule 65 of the Federal Rules of Civil Procedure (FRCP), seeking an order that Defendant Baer, in her capacity as Commissioner of OPWDD, "be immediately and temporarily enjoined to coordinate the transfer of [C.D.] to the Judge Rotenberg Educational Center, Inc. (JRC) in Massachusetts, and to fund his treatment and habilitation at JRC, until further order of this Court." Dkt. No. 4 at 1. The motion has been fully briefed, and a hearing on the motion was held on January 16, 2026. Dkt. Nos. 11, 14, 19. The following constitutes the Court's findings of fact and conclusions of law in accordance with FRCP 52(a)(2).

## II.    FINDINGS OF FACT[2]

### A.    C.D.'s Background

C.D. has exhibited symptoms of developmental disabilities since early childhood. His behavioral challenges escalated as the demands of his academic programming increased, resulting in injuries to himself and others. Various preventative strategies implemented by his school district were unsuccessful, and the inability to manage C.D.'s behavior resulted in attempted suspensions and ultimately his removal from the classroom setting in favor of one-to-one tutoring.

---

[2] The facts are taken from the verified complaint and the parties' submissions. *See J.S.R. ex rel. J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n. 38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 721 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

C.D. subsequently transitioned to Wildwood, a school providing services to students with developmental disabilities, in 2015. There were 55 documented incidents of aggressive or self-injurious behavior by C.D. between September 2015 and March 2016. Frequent physical restraints were required, and the school resorted to a timeout room. On November 4, 2016, the school district formally recommended that C.D.'s parents pursue a residential placement due to the severity of his behavioral challenges.

In November 2016, C.D. was admitted to a psychiatric hospital for a one-week in-patient stay, at which time his medications were adjusted. In December 2016, C.D.'s family and the district initiated a residential search. None of the responding New York facilities had an available bed or accepted C.D., necessitating an out-of-state search.

C.D. was no longer able to attend Wildwood due to the severity of his behaviors, and in January 2017 C.D.'s father stayed home full time to care for him. C.D.'s behaviors remained severe despite inpatient and outpatient psychiatric care, medication trials, and counseling attempts. After touring several out-of-state programs, C.D.'s parents determined that the Judge Rotenberg Educational Center (JRC) in Massachusetts was the only appropriate facility within a reasonable distance that would allow them to stay connected through frequent visits. C.D. enrolled at JRC beginning July 11, 2017.

**B.    C.D.'s Enrollment at JRC**

JRC is a community-based residential program that specializes in treating severe behavior disorders with behavioral treatment. JRC's treatment program is licensed by the Massachusetts Department of Early Education and Care and the Massachusetts Department of Developmental Services, and is approved by the New York State Education Department. JRC serves school-aged

children and adults from various states. Each year, JRC admits school-aged children who could not be adequately served in any New York school.

C.D. experienced significant success while enrolled in JRC's Applied Behavior Analysis (ABA) program.  As his behavior improved, C.D.'s services were decreased accordingly. Furthermore, JRC tapered and ultimately eliminated C.D.'s psychotropic medications while maintaining behavioral improvement.  During his JRC enrollment from 2017 through 2022, C.D. did not require hospital visits for behavioral or psychiatric reasons and had no contact with the criminal justice system.  The frequency of emergency physical restraint declined over time.

While enrolled at JRC, C.D. resided in a suburban single-family home in the greater Boston area.  C.D. ultimately earned a New York State Diploma, received an academic achievement award, and attended JRC's prom.  JRC documented significant reductions in C.D.'s behavior rates across all tracked categories between his first and last 12 months enrolled.

### C.  OPWDD Overview

OPWDD is the New York State agency responsible for coordinating services for individuals with developmental disabilities.  As relevant here, one manner in which OPWDD serves individuals requiring support and services is through the Home and Community Based Services (HCBS) Waiver via Residential Habilitation services, providing clinical services in settings including Family Care homes, Community Residences, or Individualized Residential Alternatives (IRAs).  The HCBS Waiver provides funding and allows OPWDD to develop and coordinate supports and services for New Yorkers with developmental disabilities to enable them to live, work, socialize, and participate in the community.  OPWDD also certifies Community Intermediate Care Facilities (ICF), which are residential facilities not included in the HCBS Waiver.  According to Defendant, OPWDD does not have statutory, regulatory, or contractual

authority to compel a voluntary provider to accept an individual for residential placement. Nor does OPWDD have authority to place and fund persons in out-of-state settings under its HCBS Waiver. OPWDD does, however, have discretionary authority under Mental Hygiene Law § 13.38(g) to provide emergency funding to maintain an individual in an out of state setting until an appropriate adult opportunity with an approved OPWDD provider in New York State became available.

### D. C.D.'s Return to New York

While C.D. was still enrolled in JRC, OPWDD began communicating with C.D.'s parents about placement options for C.D. after he aged out of educational funding prior to his 21st birthday, at which time OPWDD would become responsible for funding his placement and services. On September 8, 2020, C.D.'s parents participated in an OPWDD Residential Opportunities Committee meeting to introduce C.D. to potential residential provider agencies and learn about New York placements that OPWDD might pursue for him. C.D.'s parents subsequently participated in ongoing meetings and communications with OPWDD and provider agencies between 2020 and 2021. During this time, C.D.'s parents voiced their concerns that OPWDD's system lacked the clinical depth and staffing to keep him safe upon return to New York. Nevertheless, according to Plaintiffs, OPWDD was "adamant that under no circumstances would they consider allowing C.D. to remain at JRC, even though numerous other New York residents in the same circumstances had been allowed to do so under OPWDD funding."

C.D. turned 21 years old in April 2021. Because an appropriate adult opportunity in New York had not been identified at the time of his graduation in June 2021, OPWDD used its discretionary authority under M.H.L. § 13.38(g) to maintain C.D. at JRC until such an opportunity with an approved OPWDD provider in New York State became available.

In July 2021, OPWDD determined they could develop appropriate residential and day program services for C.D. within an OPWDD-operated IRA and day program.  Over the next 14 months, OPWDD developed a plan of service.  In August 2022, OPWDD proposed a placement in Niskayuna, New York.  According to Plaintiff, C.D.'s parents "believed that an administrative challenge to the proposed placement would be futile because OPWDD's representations . . . would make the placement look appropriate on paper," and "refusing the offered placement would result in the discontinuation of C.D.'s remaining funding at JRC."  C.D.'s parents instead worked with OPWDD to facilitate C.D.'s transfer to Niskayuna, and provided their consent for the proposed placement and services.

On September 29, 2022, C.D. was discharged from JRC to the care of OPWDD in Niskayuna.  The parties agree that soon after the transition, C.D. began to exhibit "escalating unsafe behaviors."  C.D. experienced behavioral episodes within weeks of the transition resulting in an emergency room visit in October 2022.  In 2023, C.D. required five emergency room visits. In June 2023, an Extreme Risk Protection Order was sought after C.D. made threats in the presence of police.  The same year, C.D. began to accrue criminal charges pressed by OPWDD staff for harassment and forcible touching.

In May 2024, C.D. sustained physical injuries allegedly at the hands of OPWDD staff. Plaintiffs contend that C.D.'s allegations of physical abuse were substantiated to some extent by a New York Justice Center investigation, including that C.D. was kicked and hit in the head, chest and back, after which he required care for a sprained right thumb and ruptured eardrum.  C.D.'s parents subsequently learned that most of the staff supervising C.D. were out of compliance with their physical intervention training.  C.D.'s emergency medical utilization continued to climb throughout 2024, and included an inpatient behavioral admission in July, multiple emergency

visits in August, further urgent care visits for injuries, diagnosis of a fractured wrist in August, and surgery for a left scaphoid fracture in September. In October 2024, C.D. was arrested for pulling a fire alarm without good cause.

In 2025, C.D. was brought for multiple emergency room visits in January and February for suicidal and homicidal ideation, ingestion of hazardous substances, violent behavioral episodes, and repeated head injuries. On April 24, 2025, C.D. was arrested for assault in the third degree. In May 2025, he required emergency room care for a behavioral crisis in which restraints and Haldol were administered. He was issued an Extreme Risk Protection Order in June 2025, and endured further emergency and urgent care encounters in June and July. C.D. made several attempts to flee in order to avoid returning to his group home in August and September 2025, which resulted in the necessity for additional medical care as well as the imposition of criminal charges. In October 2025, C.D. continued with repeated emergency room visits for head injuries, an altercation at Albany Medical Center during which he was restrained and injured, and a diagnosed ankle sprain.

On October 22, 2025, the state court issued an order of protection requiring C.D. to stay away from his OPWDD residence. As a result of the stay away order, C.D. went home with his parents while OPWDD "prepared another home with the environmental safeguards that were in place for C.D.'s safety" at Niskayuna. On October 25th, OPWDD provided a new residence for C.D. at a Comprehensive Adult Transitional Home (CATH) in Clifton Park. CATH houses are intended as temporary placements with more robust therapeutic supports before transitioning to a new permanent home. According to Plaintiffs, CATH houses are intended for short-term housing of less than 18 months, and do not constitute a permanent residential setting.

C.D. experienced further behavioral crises at the CATH house. On October 28, 2025,

Police were called after he attacked a nurse and firefighters before escaping from his day program. He was transported to Albany Med and then discharged back to the CATH house. Almost immediately he became aggressive, and CATH OPWDD staff called the police who brought him to Ellis Hospital.  Less than an hour later he was discharged back to the CATH house.  The following day, October 29, 2025, C.D. attacked a nurse at the CATH house. Police were called, and C.D. attacked a police officer. C.D. was then transported to Saratoga Hospital. C.D.'s parents were informed by Saratoga Hospital that OPWDD staff refused to sit with C.D. or supervise him at the hospital.  After his discharge from the hospital, C.D. was taken by police to the police station where he was charged with criminal mischief. After engaging in further dangerous behavior, he was returned to the hospital.  He was eventually discharged from the hospital back to the police station where he damaged property and was again charged with felony criminal mischief. C.D.'s parents needed OPWDD staff assistance to transport C.D. back to the residence.  C.D. refused to go with them alone, so C.D.'s parents followed the OPWDD vehicle back to the residence.

On October 30, 2025, C.D.'s parents began taking turns staying with C.D. at the CATH house around the clock.  Plaintiffs contend that OPWDD staff instructed C.D.'s parents to "back off" on November 3, 2025, at which time C.D.'s behavior escalated and staff responded by calling the police.  Plaintiffs further contend that during C.D.'s behavioral escalation, one or more OPWDD staff hid in the basement, while another attempted to break C.D.'s arm by closing a door on it and then locked C.D. alone in the garage.

On November 4, 2025, C.D.'s parents brought him home.  OPWDD continued to offer residential supports and services at the CATH house while alternate residential services were explored, however Plaintiffs do not want C.D. to return to that location.

E.    **OPWDD's Proposed Placements**

OPWDD operates two high security institutional facilities: Sunmount Developmental Center in Tupper Lake and Valley Ridge in Norwich. According to Plaintiffs, these secure units are surrounded by high inward-facing fences topped with razor wire to prevent escape. Plaintiffs further contend that Sunmount's small population includes persons charged with murder and other serious violent crimes who were found incompetent to stand trial. Valley Ridge serves a similar population with the same security features. Since C.D.'s services and funding were initially transitioned to OPWDD, C.D.'s parents were adamant that he did not belong in a confined institutional setting. Plaintiffs contend that OPWDD agreed these were not appropriate placements. However, when the protective order was issued barring C.D. from the Niskayuna residence, OPWDD proposed Sunmount as a solution. OPWDD later sought, and received, approval to place C.D. in Sunmount or Valley Ridge.

On November 14, 2025, OPWDD's Chief Psychologist emailed C.D.'s parents to schedule a suitability review to assess C.D. for placement in an Intensive Treatment Opportunity (ITO), operated out of Sunmount and Valley Ridge. The email indicated that C.D.'s parents would be prohibited from attending the suitability review and that one of the purposes of the suitability review would be to try to obtain C.D.'s voluntary consent to institutionalization in an ITO. Plaintiffs contend that moments after sending this email, the same Chief Psychologist sent an internal email, with instructions not to forward, explaining that because C.D.'s parents had not had their Massachusetts guardianship recognized by a New York court, OPWDD would not recognize them as his guardians. Plaintiffs further contend that at this point, OPWDD had been dealing with C.D.'s parents as his guardians for over three years after C.D.'s return to New York, without requiring their Massachusetts guardianship order to be formally recognized in New York. C.D.'s

parents immediately began the process of having their guardianship recognized in New York, which they completed on November 19th.

On approximately November 17, 2025, C.D.'s parents were informed by OPWDD that C.D. was being recommended for placement at Valley Ridge. OPWDD was also exploring other options for C.D.'s placement at the same time, and on December 18, 2025 OPWDD formally extended an offer to relocate C.D. to OPWDD'S only CATH that is certified as an ICF (CATH ICF). The CATH ICF model falls between the IRA and ITO levels of care. If C.D. were to accept this placement, Defendant maintains OPWDD intended to return him to an IRA level of care after he is medically stabilized, however he could remain there if necessary. According to Plaintiff, the CATH ICF is not a community-based placement, but is in fact an institutional facility.

### F.     C.D.'s Involuntary Admission to Valley Ridge

On January 1, 2026, C.D.'s parents brought him to the hospital to address an acute mental health crisis which included suicidality. On January 2nd, the hospital informed C.D.'s parents that C.D. had attacked staff and would be facing additional criminal charges, and the hospital could not continue to hold him. C.D.'s parents could no longer care for him at home, and feared that C.D. would be "turned out on the street or locked up in jail." Although they continued to protest C.D.'s institutionalization, due to C.D.'s condition (which they believe was exacerbated by OPWDD and his treatment in their care), C.D.'s parents reached out to OPWDD to explore the possibility of an emergency placement at an ITO. On January 6, 2026, C.D. was transferred from the hospital to Valley Ridge as an involuntary admission, based on the examination and certification of two physicians concluding that C.D. required involuntary care and treatment.

## III.    STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and

preliminary injunctions. In the Second Circuit, the standard for a temporary restraining order is the same as the one for a preliminary injunction. *See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471 (S.D.N.Y. 2010).

A party seeking a preliminary injunction must establish that: (1) it is likely to suffer irreparable harm in the absence of preliminary relief; (2) either (a) it is likely to succeed on the merits, or (b) there are sufficiently serious questions going to the merits of its claims to make them fair ground for litigation; (3) the balance of hardships tips decidedly in its favor; and (4) a preliminary injunction is in the public interest. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154, 164 (2d Cir. 2011); *accord N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). However, a "party seeking to enjoin 'governmental action taken in the public interest pursuant to a statutory or regulatory scheme' cannot rely on the 'fair ground for litigation' alternative even if that party seeks to vindicate a sovereign or public interest." *Id.* (quoting *Monserrate v. N.Y. State Senate*, 599 F.3d 148, 154 (2d Cir. 2010)).  Moreover, "when the government is the defendant and opposes the preliminary injunction, like it has done so here, the final two requirements merge together." *Nat'l Inst. of Fam. & Life Advocs. v. James*, 160 F.4th 360, 373 (2d Cir. 2025) (citing *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020)).

Courts refer to preliminary injunctions as prohibitory or mandatory; a prohibitory injunction "maintains the status quo pending resolution of the case," while a mandatory injunction "alters it." *N. Am. Soccer League*, 883 F.3d at 36. "Because mandatory injunctions disrupt the status quo, a party seeking one must meet a heightened legal standard by showing 'a clear or substantial likelihood of success on the merits.'" *Id.* (quoting *N.Y. Civil Liberties Union v. N.Y.C.*

*Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012)). The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *Id*. at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)).

Here, Plaintiffs do not dispute that C.D.'s July 2021 transfer from JRC to Niskayuna was not formally contested or challenged.  Plaintiffs claim that OPWDD's failure to transfer C.D. back to JRC since his failed placements in New York violates his right to be free from discrimination under the ADA and RA, in particular to be placed in the "most integrated setting appropriate" to his needs.  Under these circumstances, the "last actual, peaceable uncontested status" was C.D.'s placement at Niskayuna.  Thus, Plaintiffs' request for an order directing OPWDD to coordinate C.D.'s transfer back to JRC disrupts the status quo, and Plaintiff must show a clear or substantial likelihood of success on the merits.

## IV.    DISCUSSION[3]

### A.  Irreparable Harm

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to

---

[3] Plaintiffs' request for a preliminary injunction relies on their ADA and RA discrimination claims. Accordingly, the Court does not consider Plaintiff's alleged constitutional claims in its analysis.

the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010).

Here, the Court could certainly be persuaded that the ongoing denial of appropriate services and treatment to an individual suffering from severe developmental disabilities, and causing an exacerbation to those developmental disabilities and their symptoms, cannot be fully remedied by monetary damages and may constitute irreparable harm.  Nevertheless, a finding of irreparable harm cannot be based solely upon past conduct. *Haden v. Hellinger*, No. 9:14-cv-0318, 2016 WL 589703, at *1 (N.D.N.Y. Feb. 11, 2016); *Garcia v. Arevalo*, No. 93 Civ. 8147, 1994 WL 383238, at *2 (S.D.N.Y. June 27, 1994) (court cannot find likelihood of future harm based solely on past, illegal conduct).  Here, Plaintiffs' argument as to irreparable harm focuses on OPWDD's alleged deficiencies over the past three years, during a time C.D. was undisputedly eligible for community-based services.  However, there is strong evidence before the Court, including the certification of two physicians, that C.D. is currently placed in the setting most appropriate to his needs.  Plaintiffs have not presented the Court with any evidence to the contrary.  Nor have Plaintiffs established that C.D. faces an imminent threat of irreparable harm, to the extent there is no evidence before the Court that he will be, or should be, deemed appropriate for discharge from Valley Ridge in the foreseeable future.  Accordingly, Plaintiffs have failed to establish that C.D. is likely to suffer imminent irreparable harm in the absence of the injunctive relief requested.  *See Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006) ("the question is not whether the plaintiff has suffered irreparable harm, but whether it will be irreparably harmed in the absence of an injunction. In other words, *the injunction must prevent or remedy the harm*.") (emphasis added).

13

**B. Clear Likelihood of Success on the Merits of ADA/RA Claims**

To establish a violation of Title II of the ADA and Section 504 of the Rehabilitation Act,[4] Plaintiffs must prove that (1) C.D. is a "qualified individual" with a disability; (2) that the Defendant is subject to the ADA and the Rehabilitation Act; and (3) that C.D. was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or were discriminated against by Defendant, by reason of his disability. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003). Here, there is no dispute that Plaintiffs have satisfied the first two elements of this claim.

With respect to the third element, Plaintiff alleges discrimination under the theory that OPWDD's conduct violated the integration mandate issued by the United States Attorney General. The integration mandate requires that people with disabilities receive services in the "most integrated setting appropriate to their needs." 28 C.F.R. § 35.130(d) (ADA); *see* 28 C.F.R. § 41.51(d) (RA). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is a setting that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). *See also* 29 U.S.C. § 794 and 28 C.F.R. § 41.51(d). "A failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate." *Schine by Short v. New York State Off. for People with Developmental Disabilities*, No. 15-cv-5870, 2017 WL 9485650, at *5 (E.D.N.Y. Jan. 5, 2017), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017) (cleaned up).

---

[4] Plaintiffs' ADA and RA claims do not implicate any of the "subtle differences" between the two statutes, and may be analyzed together. *See Schine by Short v. New York State Off. for People with Developmental Disabilities*, No. 15-cv-5870, 2017 WL 9485650, at *4 (E.D.N.Y. Jan. 5, 2017), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017) (discussing nearly identical nature of the statutes and limited differences between them).

The key authority on point is *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, "the Supreme Court interpreted the integration mandate to mean that the 'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA." *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016) (quoting *Olmstead*, 527 U.S. at 597). The State must make "reasonable modifications" to avoid such discrimination, "unless the public entity can demonstrate conclusively that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). Thus, under *Olmstead*, Plaintiffs must show: (1) the State's treatment professionals have determined that community-based placement or services are appropriate for the plaintiffs, (2) the plaintiffs do not oppose such placement or services, and (3) the placement or services can be reasonably accommodated "taking into account the resources available to the State and the needs of others with [similar] disabilities." 527 U.S. at 607. "Defendants can rebut this prima facie case by showing that the requested accommodation would require fundamentally altering the nature of the State program." *T.C. v. New York State Dep't of Health*, No. 22-cv-5045, 2022 WL 17689841, at *10 (S.D.N.Y. Dec. 15, 2022).

"The *Olmstead* Court was careful to assert that it was not holding that the ADA requires a standard of care or level of benefits." *Edelson v. Chapel Haven, Inc.,* No. 3:15-cv-1862, 2017 WL 810274 at *10 (D. Conn. Mar. 1, 2017) (citing *Olmstead*, 527 U.S. at 603 n.14). "Instead, the mandate only requires states to 'adhere to the ADA's nondiscrimination requirement with respect to the services they actually provide.'" *Id.* Thus, "Plaintiffs who have invoked *Olmstead* to avoid a transfer between equivalently restrictive institutions because of personal preference or to seek additional funding to remain in a preferred residence have been unsuccessful." *Id.* (citing *M.D. ex rel. Davidson v. Dep't of Developmental Servs.*, 83 Mass. App. Ct. 463, 467 (2013) (observing

that Olmstead "has no real application to interinstitutional transfers"); *Leocata ex rel. Gilbride v. Wilson-Coker*, 343 F. Supp. 2d 144, 155 (D. Conn. 2004), *aff'd sub nom. Leocata v. Leavitt*, 148 F. App'x 64 (2d Cir. 2005) (rejecting plaintiff's claim that the mandate was violated when the state did not provide funding to allow her to remain in her home); *see also Rodriguez v. City of New York*, 197 F.3d 611, 619 (2d Cir. 1999) ("*Olmstead* does not . . . stand for the proposition that states must provide disabled individuals with the opportunity to remain out of institutions.")).

Here, Plaintiffs have not established a likelihood of success on the merits of their ADA and RA claims. With respect to the first *Olmstead* prong, the parties appear to dispute that community-based placement or services are appropriate for C.D. at this juncture. At base, it is evident that the "State's treatment professionals" have determined that such a placement is not appropriate for C.D., to the extent Defendant has produced the two physician certifications supporting C.D.'s recent involuntary admission to Valley Ridge.

Plaintiffs argue that *Olmstead*'s language concerning determinations "by the State's treatment professionals" does not, in fact, require such determination be made by a state mental health professional. Instead, Plaintiffs argue, the only requirement is that a *treatment professional* determine that community-based placement is appropriate. Plaintiffs have provided supporting legal authority, including at least one district case from this Circuit. *See Joseph S. v. Hogan*, 561 F. Supp. 2d 280, 291 (E.D.N.Y. 2008) ("reject[ing] defendants' argument that Olmstead requires that the state's mental health professionals be the ones to determine that an individual's needs may be met in a more integrated setting.").

Even if the Court were to accept Plaintiffs' contention that the first prong of Plaintiff's *Olmstead* claim can be satisfied by a determination from any treating professional that C.D.'s needs can be met in a more integrated setting, they have failed to present this court with any

evidence that such a determination has been made. The evidence before the Court strongly suggests that C.D. cannot presently be served by a more integrated, community-based setting. Thus, because Plaintiffs have not offered any evidence that they could satisfy the first prong of *Olmstead*, they have failed to establish a strong likelihood of success on their ADA and RA claims.

### C. Balance of Hardships and Public Interest

The Court finds that the competing, important interests of both parties renders this factor neutral. C.D.'s situation presents challenges that are not easily addressed, and Plaintiffs have legitimate concerns as to C.D.'s ongoing accessibility to appropriate and safe treatment and services. At the same time, there is a strong public interest in promoting state laws and regulations governing the provision of mental health services. Accordingly, the significant interests implicated on both sides offset one another and do not favor either party.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Dkt. No. 4, is **DENIED.**

**IT IS SO ORDERED.**

Dated: January 21, 2026

Elizabeth C. Coombe
U.S. District Judge