**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

CHRISTIAN DRIBUSCH and ELIZABETH DRIBUSCH, as legal guardians of C.D.,[1]

Plaintiffs,

1:25-cv-1721 (ECC/PJE)

v.

WILLOW BAER, as Commissioner of the Office for People with Developmental Disabilities, in her official capacity,

Defendant.

---

Michael W. Hawrylchak, *for Plaintiffs*
Elizabeth Lombardi, Asst. Att'y General, *for Defendant*

**Hon. Elizabeth C. Coombe, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

Plaintiffs Christian and Elizabeth Dribusch bring this action on behalf of their son, C.D., a twenty-six-year-old individual with serious developmental disabilities, against Defendant Willow Baer as Commissioner of New York's Office for People with Developmental Disabilities (OPWDD). *See generally* Dkt. No. 26. The Verified Amended Complaint alleges violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, et seq. (ADA); Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 in connection with OPWDD's provision of benefits and services to C.D. Presently

---

[1] As it did at the preliminary injunction stage, the Court refers to Plaintiffs' son by his initials due to the sensitive medical information discussed in this decision. *See* Dkt. No. 24 at 1 n.1. Unless otherwise noted, citations to page numbers refer to the pagination generated by the CM/ECF system.

before the Court is Defendant's motion to dismiss the Verified Amended Complaint pursuant to Federal Rules of Civil Procedure 8, 12(b)(1), and 12(b)(6). Dkt. No. 33. The motion is fully briefed. Dkt. Nos. 38, 41, 49. The Court also addresses Defendant's requests to seal certain documents. Dkt. Nos. 20, 23, 34, 42. For the following reasons, Defendant's motion to dismiss is granted in part.

## I. BACKGROUND

### A. The Verified Amended Complaint[2]

#### 1. C.D.'s Background

C.D. has exhibited symptoms of developmental disabilities since early childhood. Dkt. No. 26 ¶¶ 22-24. His behavioral challenges escalated as the demands of his academic programming increased, resulting in injuries to himself and others. *Id.* at ¶ 25. When C.D.'s school district could no longer manage his behavioral problems, C.D. was removed from the classroom setting in favor of one-on-one tutoring. *Id.* at ¶ 28.

C.D. subsequently transitioned to Wildwood, a school providing services to students with developmental disabilities, in 2015. *Id.* at ¶ 29. There were 55 documented incidents of aggressive or self-injurious behavior by C.D. between September 2015 and March 2016. *Id.* Frequent physical restraints were required, and the school resorted to a timeout room. *Id.* On November 4, 2016, the school district formally recommended that C.D.'s parents pursue a residential placement due to the severity of his behavioral challenges. *Id.* at ¶ 30. In December 2016, C.D.'s family and the

[2] These facts are drawn from the Verified Amended Complaint. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations, *see Lynch v. City of New York*, 952 F.3d 67, 74-75 (2d Cir. 2020), but does not accept as true any legal conclusions, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

district initiated a residential search. *Id.* None of the responding New York facilities had an available bed or accepted C.D., necessitating an out-of-state search. *Id.*

C.D. was no longer able to attend Wildwood due to the severity of his behaviors, and in January 2017 C.D.'s father stayed home full-time to care for him. *Id.* After touring several out-of-state programs, C.D.'s parents determined that the Judge Rotenberg Educational Center (JRC) in Massachusetts was the only appropriate facility within a reasonable distance that would allow them to stay connected through frequent visits. *Id.* at ¶ 31. C.D. enrolled at JRC beginning July 11, 2017. *Id.*

**2. C.D.'s Enrollment at JRC**

JRC is a "community-based residential program" that "specializes in treating severe behavior disorders with behavioral treatment." *Id.* at ¶ 33. JRC's treatment program is licensed by the Massachusetts Department of Early Education and Care and the Massachusetts Department of Developmental Services, and is approved by the New York State Education Department. *Id.* at ¶ 34. JRC serves school-aged children and adults from various states. *Id.* at ¶ 35. Each year, JRC admits school-aged children who could not be adequately served in any New York school. *Id.* at ¶ 36.

C.D. enrolled in JRC's Applied Behavior Analysis program, which "dynamically adjusted to [C.D.'s] response through more than 200 discrete treatment modifications over time." *Id.* at ¶ 38. As his behavior improved, C.D.'s services were decreased accordingly. *Id.* JRC tapered and ultimately eliminated C.D.'s psychotropic medications while maintaining behavioral improvement. *Id.* During his JRC enrollment from 2017 through 2022, C.D. did not require hospital visits for behavioral or psychiatric reasons and had no contact with the criminal justice system. *Id.* at ¶ 40. The frequency of emergency physical restraints declined over time. *Id.*

While enrolled at JRC, C.D. resided in a suburban single-family home in the greater Boston area. *Id.* at ¶ 39. C.D. ultimately earned a New York State Regents Diploma, received an academic achievement award, and attended JRC's prom. *Id.* at ¶ 42. JRC documented significant reductions in C.D.'s behavior rates across all tracked categories between his first and last 12 months enrolled. *Id.* at ¶ 43.

**3. C.D.'s Return to New York**

OPWDD, a New York State agency responsible for coordinating services for New Yorkers with developmental disabilities, began communicating with C.D.'s parents while C.D. was still enrolled at JRC about placement options for C.D. after he aged out of educational funding, at which time OPWDD would become responsible for funding his placement and services. *Id.* at ¶¶ 19, 44-47. C.D.'s parents participated in ongoing meetings and communications with OPWDD and provider agencies between 2020 and 2021. *Id.* at ¶ 48. During this time, C.D.'s parents voiced their concerns that OPWDD's system "lacked the clinical depth and staffing to keep him safe if returned to New York." *Id.* JRC "reinforced these concerns during regular multi-party meetings," and "multiple [New York] agencies declined to offer services after screening [C.D.]." *Id.* at ¶¶ 48, 50. Nevertheless, OPWDD was "adamant that under no circumstances would they consider allowing [C.D.] to remain at JRC, even though numerous other New York residents in the same circumstances had been allowed to do so under OPWDD funding." *Id.* at ¶ 51.

C.D. aged out of educational funding in June 2021, and OPWDD "assumed responsibility for funding his placement at JRC." *Id.* at ¶ 49. OPWDD eventually proposed a residential placement in Niskayuna, New York. *Id.* at ¶ 52. Plaintiffs expressed their fear that OPWDD staff "would be unable to manage [C.D.'s] behaviors or handle him when he had a severe aggressive episode" and that C.D. would become "enmeshed" in the criminal justice system which could serve as a justification for an institutional placement. *Id.* ¶ 54. OPWDD "dismissed these concerns as

overwrought." *Id.* Plaintiffs "believed that an administrative challenge to the proposed placement would be futile because OPWDD's representations . . . would make the placement look appropriate on paper," and "[r]efusing the offered placement would result in the discontinuation of C.D.'s remaining funding at JRC," which Plaintiffs could not afford. *Id.* at ¶ 55. Plaintiffs therefore opted to work with OPWDD to facilitate C.D.'s transfer to Niskayuna. *Id.*

C.D. was discharged from JRC to the care of OPWDD in Niskayuna on September 29, 2022. *Id.* at ¶ 57. On October 11, 2022, OPWDD staff "forcibly hospitalized" C.D. to manage his behavior. *Id.* In the months that followed, C.D.'s behavioral condition "deteriorated significantly." *Id.* at ¶ 58. In June 2023, an Extreme Risk Protection Order was sought after C.D. made threats in the presence of police. *Id.* at ¶ 60. The same year, C.D. began to accrue criminal charges pressed by OPWDD staff for harassment and forcible touching. *Id.*

In May 2024, C.D. "suffered severe physical abuse by OPWDD staff when he was kicked and struck in the head, chest, and back, resulting in hospitalization for a ruptured eardrum among other injuries." *Id.* at ¶ 61 (alleging this abuse was later substantiated by a New York Justice Center investigation). In 2024, genetic testing completed at the recommendation of OPWDD's psychiatrist indicated that a number of common psychotropic medications, including Thorazine, were contraindicated for C.D. due to his genetics. *Id.* at ¶ 63.

C.D.'s condition "continued to deteriorate" through 2024 and into 2025, and C.D. was "repeatedly hospitalized for both physical injuries and behavioral management and repeatedly subjected to four-point restraints." *Id.* at ¶ 64. An undiagnosed wrist fracture was discovered in August 2024. *Id.* In September 2024, OPWDD staff "allowed [C.D.] to escape from the residence"; he was later apprehended by police and was arrested and charged with felony assault after biting a police officer. *Id.* at ¶ 65.

On October 22, 2025, at a court appearance for a criminal charge, the court issued an order of protection barring C.D. from his OPWDD residence. *Id.* at ¶ 66. As a result of the stay away order, C.D. went home with his parents. *Id.* On October 25, OPWDD "provided a new residence" for C.D. at a Comprehensive Adult Transitional Home (CATH) in Clifton Park. *Id.* at ¶ 67. CATH houses are "intended as temporary placements with more robust therapeutic supports before transitioning to a new permanent home." *Id.*

On October 28, 2025, police were called and C.D. was forcibly hospitalized on two separate occasions. *Id.* at ¶ 68. C.D. was arrested and hospitalized again on October 29, and on October 30 he was transported from the hospital to the police station "where he had another behavioral episode resulting in his return to the hospital." *Id.* C.D. was then "returned to the police station where he received several criminal charges." *Id.* Due to C.D.'s "overwhelming fear of OPWDD staff, his parents accompanied him back to the CATH house following his release from the police station" and began taking turns staying with C.D. at the CATH house around the clock. *Id.* at ¶ 69. OPWDD staff instructed C.D.'s parents to "back off" on November 3, 2025, at which time C.D.'s behavior escalated and staff responded by calling the police. *Id.* at ¶ 70. During C.D.'s behavioral escalation, one or more OPWDD staff hid in the basement, while another attempted to break C.D.'s arm by closing a door on it and then locked C.D. alone in the garage. *Id.* On November 4, 2025, C.D.'s parents brought him home. *Id.* at ¶ 72.

**4. OPWDD's Proposed Placements**

After C.D.'s removal from the Niskayuna home, OPWDD "sought and received approval from its Statewide Advisory Committee to institutionalize [C.D.]" at one of OPWDD's two highest security institutional facilities. *Id.* at ¶¶ 74, 77. Sunmount Developmental Center in Tupper Lake and Valley Ridge in Norwich are surrounded by high inward-facing fences topped with razor wire to prevent escape, and their populations include individuals "charged with murder and other

serious violent crimes but found incompetent to stand trial." *Id.* at ¶ 75.

On November 14, 2025, OPWDD's Chief Psychologist emailed C.D.'s parents to schedule a suitability review to assess C.D. for placement in an Intensive Treatment Opportunity (ITO) program operated out of Sunmount or Valley Ridge. *Id.* at ¶ 78. The email indicated that C.D.'s parents would be prohibited from attending the suitability review and that one of the purposes of the review would be to seek C.D.'s voluntary consent to institutionalization in an ITO. *Id.* Moments after sending this email, the same Chief Psychologist sent an internal email, with instructions not to forward, explaining that because C.D.'s parents had not had their Massachusetts guardianship recognized by a New York court, OPWDD would not recognize them as his guardians, even though OPWDD had been dealing with C.D.'s parents as his guardians for over three years. *Id.* at ¶¶ 80-81. The internal email was inadvertently forwarded to C.D.'s parents, who immediately began the process of having their guardianship recognized in New York, completing the process on November 19. *Id.* at ¶¶ 80, 82.

On November 17, 2025, OPWDD informed C.D.'s parents that C.D. was being recommended for placement at Valley Ridge. *Id.* at ¶ 83. After Plaintiffs commenced this lawsuit seeking to compel OPWDD to return C.D. to JRC, OPWDD offered C.D. a placement at the Bernard Fineson Intermediate Care Facility (ICF) in Queens, an institutional placement. *Id.* at ¶¶ 85, 86. C.D.'s mother toured the Bernard Fineson CATH ICF on December 26, 2025 and was informed that a preliminary behavior support plan for C.D. had not yet been developed, staff training would take at least another two weeks, and "critical safety features" for C.D. "could not be implemented immediately, if ever." *Id.* at ¶ 87. C.D.'s mother also learned that Plaintiffs would be prohibited from visiting C.D. inside the residence and having any contact with him for three weeks, after which C.D. would be limited to two phone calls per week. *Id.* at ¶ 88.

### 5. C.D.'s Involuntary Admission to Valley Ridge

C.D. had a "violent and aggressive episode coupled with an acute mental health crisis" on January 1, 2026, prompting C.D.'s parents to bring him to the Capital District Psychiatric Center (CDPC) for treatment. *Id.* at ¶¶ 91-93. C.D. was admitted, and his parents informed CDPC of C.D.'s medication history and warned that Thorazine was contraindicated. *Id.* at ¶ 94. CDPC nonetheless administered Thorazine to C.D. at some point after his admission. *Id.* at ¶ 95.

On January 2, the hospital informed C.D.'s parents that C.D. had assaulted staff and would be facing additional criminal charges, and the hospital could not continue to hold him. *Id.* at ¶ 96. Although C.D.'s parents continued to oppose institutionalization, they felt they could no longer care for him at home and reached out to OPWDD to explore the possibility of an emergency placement at an ITO. *Id.* at ¶¶ 97-98. That same day, OPWDD informed C.D.'s parents that CDPC had agreed to hold C.D. until January 5 and that OPWDD expected to have an emergency placement available for that date, although it refused to disclose "where or what type of placement this would be." *Id.* at ¶ 99. C.D. "spent much of the weekend fully restrained" and CDPC continued to administer Thorazine. *Id.* at ¶ 101.

On January 5, 2026, two CDPC physicians evaluated C.D. and "recommended his involuntary commitment." *Id.* at ¶ 103. OPWDD notified C.D.'s parents by email that OPWDD had initiated the process to have C.D. involuntarily committed to an OPWDD ITO. *Id.* at ¶ 105. On January 6, C.D. was transferred from the hospital to Valley Ridge as an involuntary admission, although Plaintiffs were not notified prior to his removal from CDPC. *Id.* at ¶¶ 106-07. Once Thorazine was discontinued at Valley Ridge, C.D.'s behavioral issues "improved markedly." *Id.* at ¶ 108.

Plaintiffs allege that C.D. can be properly served in a community-based setting and that his institutionalization is "cruel, unnecessary, and counterproductive." *Id.* at ¶¶ 110-11. According to

Plaintiffs, JRC "remains ready and willing to take [C.D.] on short notice" and its clinicians, who are familiar with C.D., are "confident that they can care for him in JRC's community-based setting." *Id.* at ¶ 114.

**B. Relevant Procedural History & Subsequent Events**

Plaintiffs commenced this action on December 9, 2025, before C.D. was involuntarily admitted to Valley Ridge. *See* Dkt. No. 1. Plaintiffs moved for a temporary restraining order and preliminary injunction, seeking an order enjoining Defendant to coordinate C.D.'s transfer to, and funding at, JRC. Dkt. No. 4. While that application was pending, C.D. was admitted to Valley Ridge. *See supra* Section I.A.5. On January 21, 2026, the Court issued a Memorandum-Decision and Order denying Plaintiffs' motion for preliminary relief, concluding that Plaintiffs failed to establish that C.D. was likely to suffer imminent irreparable harm or a likelihood of success on the merits of their ADA and Rehabilitation Act claims. Dkt. No. 24.

New York Mental Hygiene Law authorizes an involuntary commitment to last up to 60 days, after which (1) OPWDD may apply to a court for authority to continue to retain the individual involuntarily, (2) OPWDD may discharge the individual, or (3) the individual may choose to convert to "voluntary" status. *See* N.Y. Mental Hyg. Law §§ 15.13, 15.15, 15.21, 15.33. At a February 6, 2026 meeting, OPWDD staff discussed with Plaintiffs and C.D. the "differences between [C.D.'s] being admitted to Valley Ridge on an involuntary versus voluntary basis" and that conversion to voluntary status "may be beneficial because it would give [C.D.] more autonomy and control over the decision making process." Dkt. No. 41-1 ¶ 7. C.D. was evaluated by an OPWDD psychologist on February 10, 2026 and found suitable for conversion to voluntary status. *Id.* at ¶¶ 8-10. The psychologist noted C.D.'s understanding that he needs to make a request if he wishes to leave Valley Ridge and that he will "either be deemed safe to leave or have the right to go before a judge to decide if he should leave." *Id.* at ¶ 9.

C.D. was converted to voluntary status on March 6, 2026. *Id.* at ¶ 11. According to Plaintiffs, after C.D. was involuntarily committed, OPWDD has repeatedly informed them that C.D. "had no alternative placement and that OPWDD believed it could and would obtain a court order to continued [C.D.'s] involuntary commitment." Dkt. No. 49-1 ¶ 3 (Declaration of Christian Dribusch). OPWDD "confirmed that the purpose of recharacterizing [C.D.'s] status as voluntary was to enable some therapeutic benefits" but that the change in status "would not result in [C.D.'s] discharge from Valley Ridge or placement in the community." *Id.* at ¶ 4. Thus, Plaintiffs' position is that C.D. "faced only two options: remaining at Valley Ridge under involuntary status or remaining at Valley Ridge under voluntary status." *Id.* at ¶ 6; *see also* Dkt. No. 49-2 ¶¶ 2-3 (C.D. affirming that he was told he "would continue to be held involuntarily" if he did not convert to voluntary status and that he "would rather be on voluntary [than involuntary] status" because "it gives [him] a little more freedom").

## II. LEGAL STANDARD

"A court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." *Mann v. N.Y. State Ct. of Appeals*, No. 21-cv-49 (MAD/CFH), 2021 WL 5040236, at *3 (N.D.N.Y. Oct. 29, 2021) (citation omitted). "A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Forjone v. Dep't of Motor Vehicles*, 414 F. Supp. 3d 292, 297-98 (N.D.N.Y. 2019) (cleaned up). "In resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true[ ] and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (citation omitted). A court may also "refer to evidence outside the pleadings" and "take judicial notice of documents

in the public record." *Krajisnik Soccer Club, Inc. v. Krajisnik Football Club, Inc.*, No. 20-cv-1140 (LEK/TWD), 2021 WL 2142924, at *2 (N.D.N.Y. May 26, 2021) (citations omitted).

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). A court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## III. DISCUSSION

The Verified Amended Complaint asserts four causes of action: (1) discrimination in violation of Title II of the ADA; (2) discrimination in violation of Section 504 of the Rehabilitation Act; (3) violation of the Fourteenth Amendment's Equal Protection Clause; and (4) violation of the Fourteenth Amendment's Due Process Clause. Dkt. No. 26 ¶¶ 136-78. Plaintiffs seek declarations that Defendant "has violated and continues to violate" C.D.'s rights and an injunction (1) enjoining Defendant from violating Title II of the ADA, Section 504 of the Rehabilitation Act, and 42 U.S.C. § 1983 "with regard to the care and purported treatment of [C.D.];" (2) "ordering Defendant to provide [C.D.] the appropriate treatment and habilitation to which he is entitled pursuant to law"; and (3) ordering Defendant to transfer to and fund [C.D.'s] placement at JRC, the only appropriate treatment facility willing to accept [C.D.], until another placement can be

found that is demonstrably appropriate to meet all of [C.D.'s] needs." *See id.* at 36-37. Defendant moves to dismiss the Verified Amended Complaint in its entirety.

**A. Mootness**

Defendant first argues that this case is now moot, depriving the Court of subject-matter jurisdiction. Defendant's mootness argument was initially premised on C.D.'s involuntary commitment and ineligibility for a community-based placement, Dkt. No. 33-2 at 12-14, and then on C.D.'s conversion to voluntary status, Dkt. No. 41 at 8-10. Plaintiffs argue that the case is not moot because they allege that C.D.'s current institutionalization violates his rights and the Court has the power to provide relief from that institutional confinement. Dkt. No. 38 at 19-21. Plaintiffs further argue that C.D.'s "nominal" change to a "voluntary" legal status does not moot the case because OPWDD continues to not offer "any alternative placement" and has indicated it will "revoke this [voluntary] status if [C.D.] actually tries to leave" Valley Ridge. Dkt. No. 49 at 10-11.

A case becomes moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (citation omitted), making it "impossible for a court to grant any effectual relief whatever to the prevailing party," *New York v. Trump*, 158 F.4th 458, 464 (2d Cir. 2025) (citation omitted). The Court's obligation to limit its review to "live cases and controversies . . . extends through the entire life of a case." *Srour v. New York City, N.Y.*, 117 F.4th 72, 81 (2d Cir. 2024) (noting that "when a case becomes moot, the federal courts lack subject matter jurisdiction over the action") (citations omitted).

The Court agrees with Plaintiffs that it is still possible for the Court to grant them effectual relief should they prevail on their claims. The thrust of the Verified Amended Complaint is that the present institutionalization of C.D. violates his rights, OPWDD is not offering any non-

institutional alternatives, and OPWDD could be ordered to provide C.D. with a non-institutional alternative. *See generally* Dkt. No. 26. Because C.D. remains institutionalized, the dispute between the parties is still "live" and Plaintiffs maintain a cognizable stake in the outcome. Defendant disputes that C.D.'s rights are being violated and that Plaintiffs are entitled to any relief, but her arguments go to the merits of Plaintiffs' claims, not mootness. An "argument that claims mootness based on a challenge to 'the legal availability of a certain kind of relief . . . confuses mootness with the merits.'" *Trump*, 158 F.4th at 464 (quoting *Chevron Corp. v. Donziger*, 833 F.3d 74, 127 (2d Cir. 2016)). "Unless the possibility of relief is 'so implausible that it is insufficient to preserve jurisdiction,' a litigant's 'prospects of success are . . . not pertinent to the mootness inquiry.'" *Id.* (quoting *Chafin v. Chafin*, 568 U.S. 165, 174 (2013)).

Here, because Plaintiffs have "at least *some* prospect" of succeeding on their claims and obtaining the relief sought, the Court cannot say they have "no concrete interest" in the outcome of this case. *See id.* Thus, Defendant's motion to dismiss for mootness is denied.

**B. Eleventh Amendment Immunity**

Defendant next argues that Plaintiffs' claims for declaratory relief are barred by the Eleventh Amendment, contending that the declaratory relief sought is retrospective and Plaintiffs have not alleged an ongoing violation of C.D.'s rights. Dkt. No. 33-2 at 14-17. Plaintiffs respond that they seek "prospective relief" governing C.D.'s present and future placement which is not barred by the Eleventh Amendment. Dkt. No. 38 at 22.[3]

[3] Neither the Supreme Court nor the Second Circuit has squarely decided whether Eleventh Amendment immunity "constitutes a true issue of subject matter jurisdiction or is more appropriately viewed as an affirmative defense." *Allco Fin. Ltd. v. Roisman*, No. 22-2726, 2023 WL 4571965, at *1 (2d Cir. July 18, 2023) (summary order) (citation omitted). However, sovereign immunity is commonly treated by district courts as jurisdictional, and the Second Circuit has routinely affirmed dismissals on immunity grounds based on a lack of subject matter jurisdiction. *See Sanders v. New York State*, No. 24-cv-1432 (ECC/TWD), 2025 WL 2645541, at *3 n.4 (N.D.N.Y. Sept. 15, 2025) (collecting cases). The Second Circuit also recently reaffirmed

"Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." *Unkechaug Indian Nation v. Seggos*, 126 F.4th 822, 829 (2d Cir. 2025) (citation omitted). Absent a State's waiver of its immunity, or valid abrogation of that immunity by appropriate federal legislation, "federal courts may not entertain a private person's suit against a State," *Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 253-54 (2011), or "certain actions against state agents and state instrumentalities," *Baroni v. Port Auth. of N.Y. & N.J.*, 161 F.4th 48, 56 (2d Cir. 2025) (citation omitted).[4]

In *Ex parte Young*, 209 U.S. 123 (1908), the Supreme Court recognized a "narrow exception" to Eleventh Amendment and sovereign immunity that "allows certain private parties to seek judicial orders in federal court preventing state executive officials from enforcing state laws that are contrary to federal law." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021); *see also 74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) (noting that this exception exists for "claims for prospective relief against state officials in their official capacities"). To determine whether the *Ex parte Young* doctrine applies, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and

---

this practice by holding that a district court erred by dismissing claims as barred by sovereign immunity with prejudice. *See Karupaiyan v. New York*, No. 23-1257, 2024 WL 2174272, at *2 (2d Cir. May 15, 2024) (summary order) ("[B]ecause the district court lacked jurisdiction over the claims against the State of New York, it was erroneous to dismiss those claims with prejudice rather than without prejudice."). Accordingly, the Court addresses Defendant's immunity argument before considering merits-based arguments.

[4] It is well-settled that New York has not waived, nor has Congress abrogated, its sovereign immunity with respect to claims brought under 42 U.S.C. § 1983. *See, e.g.*, *Morris v. N.Y. State Police*, 268 F. Supp. 3d 342, 359 (N.D.N.Y. 2017). The parties do not address waiver or abrogation with respect to Plaintiffs' ADA or Rehabilitation Act claims. *See, e.g.*, *T.W. v. N.Y. State Bd. of Law Examiners*, 110 F.4th 71, 82 (2d Cir. 2024) (describing the "claim-by-claim" inquiry for determining whether Congress's purported abrogation of immunity for Title II claims is valid); *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 537 (S.D.N.Y. 2014) (concluding that New York "has waived sovereign immunity with respect to Rehabilitation Act claims" given its acceptance of federal funds on condition of waiving immunity (citation and brackets omitted)).

seeks relief properly characterized as prospective." *Unkechaug Indian Nation*, 126 F.4th at 829 (citation omitted). The inquiry for determining whether an "ongoing violation" exists is whether "the enforcement of the law amount[s] to a continuous violation of [Plaintiffs'] constitutional rights or a single act that continues to have negative consequences" for them. *Brown v. New York*, 975 F. Supp. 2d 209, 223 (N.D.N.Y. 2013) (citation omitted).

Here, the Court concludes that Plaintiffs have not alleged an ongoing violation of federal law in connection with their Section 1983 claim for violation of C.D.'s Fourteenth Amendment Due Process rights. Both the Verified Amended Complaint and Plaintiffs' briefing indicate that the due process claim is premised on OPWDD's alleged "underhanded efforts to obtain [C.D.'s] institutionalization," including "secretly deciding to stop recognizing [C.D.'s] parents' guardianship . . . in order to bypass them," initiating the institutionalization process "while withholding notice" from Plaintiffs, and "withholding notice of where and when [C.D.] would be institutionalized" until after he had already been moved. Dkt. No. 26 ¶ 175; *see also* Dkt. No. 38 at 29-31 (describing the "actions leading up to [C.D.'s] involuntary commitment" as "egregious and shocking to the conscience"). This conduct, which Plaintiffs allege violated C.D.'s due process rights, occurred in the past, and Plaintiffs have not alleged any facts suggesting that such conduct is ongoing or likely to occur again. Thus, Plaintiffs' due process claim is barred by sovereign immunity.

The Court concludes that Plaintiffs have, however, sufficiently alleged an ongoing violation of C.D.'s rights under Title II of the ADA, the Rehabilitation Act, and the Equal Protection Clause. Although Defendant disputes the legal viability of those claims, their thrust is that C.D.'s present institutionalization at Valley Ridge, and OPWDD's continued refusal to transfer C.D. to JRC and fund his treatment there despite funding other New York adults there,

violate C.D.'s federal rights. *See generally* Dkt. No. 26.[5] Further, Plaintiffs request forward-looking, prospective declaratory and injunctive relief related to these alleged ongoing violations. Specifically, they request a declaration that Defendant "continues to violate" C.D.'s rights and injunctive relief ordering Defendant to "transfer to and fund [C.D.'s] placement at JRC, the only appropriate treatment facility willing to accept [C.D.], until another placement can be found that is demonstrably appropriate to meet all of [C.D.'s] needs." Dkt. No. 26 at 36-37. Thus, these claims are not barred by sovereign immunity or the Eleventh Amendment.

Although Plaintiffs also seek a declaration that Defendant "has violated" C.D.'s federal rights, it is unclear precisely which conduct this declaration would apply to, outside of the alleged ongoing violations. Plaintiffs' requests for declaratory relief are barred to the extent they seek a declaration that Defendant's conduct wholly occurring in the past was unlawful.

Accordingly, the Court dismisses Plaintiffs' Section 1983 due process claim (fourth claim for relief) and any requests for purely retrospective declaratory relief as barred by sovereign immunity and the Eleventh Amendment.

**C. Rule 8**

Defendant moves to dismiss the Verified Amended Complaint under Federal Rule of Civil Procedure 8, arguing that the pleading is "prolix" and "highly repetitive" with "inflammatory language." Dkt. No. 33-2 at 17-19. Plaintiffs respond that there is "nothing out of the ordinary

---

[5] Defendant argues in reply that there is no ongoing violation of C.D.'s rights because C.D. "voluntarily remains" at Valley Ridge, a fact which is outside the Verified Amended Complaint. Dkt. No. 41 at 11. Even if the Court were to consider that C.D. has subsequently been converted from "involuntary" to "voluntary" commitment status, Plaintiffs nonetheless contend that C.D. was never offered an alternative to leaving Valley Ridge and still has a right to a community-based placement.

about the length or complexity" of the Verified Amended Complaint, which is easily understandable. Dkt. No. 38 at 34-37.

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Violations of this requirement are "found only in extreme circumstances." *A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 266 n.7 (N.D.N.Y. 2022) (citations omitted); *see also Salahuddin v. Cuomo*, 861 F.2d 40, 42 (2d Cir. 1988) (noting that dismissal of a complaint for failure to comply with Rule 8 "is usually reserved for those cases in which the complaint is so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised"). Here, the Verified Amended Complaint is 37 pages, asserts four distinct claims for relief, and is organized and comprehensible. It therefore satisfies Rule 8 and is not subject to dismissal on this basis.

**D. ADA and Rehabilitation Act Claims**

Defendant moves to dismiss Plaintiffs' ADA and Rehabilitation Act claims, arguing that C.D. cannot be served in an integrated, community-based setting. Dkt. No. 33-2 at 19-27. Plaintiffs respond that they have plausibly alleged that C.D. can be served in a community-based setting and therefore that his continued institutionalization violates the integration mandate of these statutes. Dkt. No. 38 at 11-19, 23-27.[6]

To state a claim for violation of Title II of the ADA and Section 504 of the Rehabilitation Act,[7] Plaintiffs must allege that (1) C.D. is a "qualified individual" with a disability; (2) Defendant

---

[6] Because Plaintiffs allege that C.D.'s continued institutionalization violates the ADA and Rehabilitation Act's integration mandate, the Court does not address Defendant's arguments relative to disparate impact and failure to provide a reasonable accommodation theories of liability.

[7] Plaintiffs' ADA and Rehabilitation Act claims do not implicate any of the "subtle differences" between the two statutes, and may be analyzed together. *See Schine by Short v. N.Y. State Off. for People with Developmental Disabilities*, No. 15-cv-5870, 2017 WL 9485650, at *4 (E.D.N.Y. Jan.

is subject to the ADA and the Rehabilitation Act; and (3) C.D. was denied the opportunity to participate in or benefit from the Defendant's services, programs, or activities, or was otherwise discriminated against by Defendant, by reason of his disability. *See Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003).

Here, only the third element is in dispute. Plaintiffs allege discrimination under the theory that OPWDD's conduct violated the integration mandate issued by the United States Attorney General. The integration mandate requires that people with disabilities receive services in the "most integrated setting appropriate to the[ir] needs." 28 C.F.R. § 35.130(d) (ADA); *see* 28 C.F.R. § 41.51(d) (Rehabilitation Act). "[T]he most integrated setting appropriate to the needs of qualified individuals with disabilities" is a setting that "enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. A, p. 450 (1998). "A failure to provide placement in a setting that enables disabled individuals to interact with non-disabled persons to the fullest extent possible violates the ADA's integration mandate." *Schine*, 2017 WL 9485650, at *5 (cleaned up).

The key authority on point is *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999). In *Olmstead*, "the Supreme Court interpreted the integration mandate to mean that the 'unjustified isolation' of disabled individuals in institutionalized care facilities constitutes discrimination on the basis of disability under the ADA." *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016) (quoting *Olmstead*, 527 U.S. at 597). The State must make "reasonable modifications" to avoid such discrimination, "unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7)(i).

5, 2017) (discussing nearly identical nature of the statutes and limited differences between them), *report and recommendation adopted*, 2017 WL 1232530 (E.D.N.Y. Mar. 31, 2017).

Thus, as summarized by the *Olmstead* Court, Title II of the ADA requires States to provide community-based treatment for individuals with disabilities when "[1] the State's treatment professionals determine that such placement is appropriate, [2] the affected persons do not oppose such treatment, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with [similar] disabilities." 527 U.S. at 607. "Defendants can rebut this *prima facie* case by showing that the requested accommodation would require fundamentally altering the nature of the State program." *T.C. v. N.Y. State Dep't of Health*, No. 22-cv-5045, 2022 WL 17689841, at *10 (S.D.N.Y. Dec. 15, 2022).

Here, Defendant argues that Plaintiffs have not stated a claim for violation of the integration mandate because the mandate "applies only when the State's medical professionals determine that an individual can be treated in a community-based setting," and because two State physicians evaluated C.D. on January 5, 2026 and recommended his involuntary commitment. Dkt. No. 33-2 at 20-21; *see* Dkt. No. 26 ¶ 103.[8] Plaintiffs respond that *Olmstead* does not absolutely require a determination from the *State's* medical professionals and that Plaintiffs have plausibly alleged a community-based placement is appropriate for C.D. Dkt. No. 38 at 11-19.

As Plaintiffs point out, several courts have rejected the argument that the determination of the State's medical professionals is dispositive of a plaintiff's integration mandate claim under the ADA or Rehabilitation Act. These courts, while recognizing that *Olmstead* referred to the determination of the "State's treatment professionals," note that this reference "appears to be based on the particular facts of that case and not central to the Court's holding." *Joseph S. v. Hogan*, 561

[8] Defendant cites to these physicians' Certificates of Examination, which she submitted in opposition to Plaintiffs' motion for preliminary injunctive relief. Dkt. No. 19-4. However, these reports are not incorporated by reference in or integral to the Verified Amended Complaint and therefore may not be considered by the Court in evaluating Defendant's Rule 12(b)(6) motion to dismiss.

F. Supp. 2d 280, 291 (E.D.N.Y. 2008) (noting that the determination regarding community placement in *Olmstead* were made by the plaintiffs' treating professionals, who "also happened to be the state's treatment professionals simply because the plaintiffs were institutionalized"); *see also, e.g.*, *Day v. District of Columbia*, 894 F. Supp. 2d 1, 23-24 (D.D.C. 2012) (noting that *Olmstead* "did not hold" that a determination from the State's professionals was "required to state a claim" and that "lower courts have universally rejected the absolutist interpretation" proposed by defendant) (collecting cases); *Harrison v. Young*, 103 F.4th 1132, 1138 (5th Cir. 2024) (finding no error in "considering the various medical opinions proffered by the parties" and finding summary judgment inappropriate where parties presented "conflicting medical opinions as to [the plaintiff's] necessary level of care"). Other courts implicitly reject the argument by simply referring to the determination of a treating provider, without further qualification. *See, e.g.*, *Fisher v. Okla. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) (stating that *Olmstead* requires community placement "when treatment professionals have determined that [it] is appropriate"); *M.G. v. N.Y.S. Off. of Mental Health*, 572 F. Supp. 3d 1, 14 (S.D.N.Y. 2021) (referring to determination by "treatment professionals" that community-based services are appropriate). Here, where the Second Circuit has not directly confronted this issue and where Defendant does not respond to Plaintiffs' argument regarding what *Olmstead* requires, the Court concludes that Defendant has not demonstrated her entitlement to dismissal of the ADA and Rehabilitation Act claims based simply on the fact that two State physicians recommended C.D.'s involuntary commitment.[9]

[9] *See also* Statement of the Department of Justice on Enforcement of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead* v. L.C., https://www.ada.gov/resources/olmstead-mandate-statement/ (last updated Feb. 28, 2020) ("[T]he ADA and its regulations do not require an individual to have had a state treating professional make

Furthermore, the Verified Amended Complaint contains sufficient factual allegations to plausibly allege that a community-based placement would be appropriate for C.D. For example, Plaintiffs allege that C.D. has a history of "thriving" in a community-based placement, that OPWDD has consistently deemed C.D. appropriate for a community-based placement over the course of years, and that JRC considers C.D. an appropriate candidate for its program and is willing to offer C.D. a placement. *See, e.g.*, Dkt. No. 26 ¶¶ 32, 37-43, 52, 67, 112-14. Plaintiffs also allege that the January 5, 2026 determination by two OPWDD physicians is unreliable, because it was rushed and conducted while C.D. was being mis-medicated with Thorazine. *See id.* at ¶¶ 94-95, 100-04, 108. Accepting these facts as true and drawing all reasonable inferences in Plaintiffs' favor, they have plausibly alleged that C.D. has been deemed appropriate for a community-based placement. *See, e.g.*, *Lindsay v. Navarretta*, No. 22-cv-1518, 2024 WL 5125954, at *9 (D. Conn. Dec. 16, 2024) (noting that the "factual dispute" about "whether the State's treating professionals have actually determined that community placement is appropriate" is "not suitable for resolution on a motion to dismiss").

Defendant next argues that Plaintiffs have not alleged that a community placement for C.D., and specifically Plaintiffs' requested placement at JRC, can be "reasonably accommodated" because there is "no mechanism" for OPWDD to return an individual to a prior residential school placement or fund the return. Dkt. No. 33-2 at 24-25 (citing N.Y. Mental Hyg. Law § 13.38(g)); *see* 28 C.F.R. § 35.130(b)(7)(i) ("A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would

---

such a determination. People with disabilities can also present their own independent evidence of the appropriateness of an integrated setting . . . .").

fundamentally alter the nature of the service, program, or activity."). But the Second Circuit has held that "the ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision." *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 163 (2d Cir. 2013); *see id.* at 158 n.5 (noting that 28 C.F.R. § 35.130(b)(7) was intended to implement 42 U.S.C. § 12131(2)). Thus, Defendant's argument that the transfer and funding of C.D. to JRC is not authorized by state law is not, itself, a sufficient basis to dismiss Plaintiffs' ADA and Rehabilitation Act claims at this stage. *See id.* at 165 (noting that the determination of what constitutes reasonable modification is a "highly fact-specific, . . . case-specific inquiry"). Furthermore, Plaintiffs allege that "there are currently approximately 73 New York State adults residing at JRC under OPWDD funding after aging out of educational funding, some of whom have been there for decades," Dkt. No. 26 ¶ 46, plausibly suggesting that Plaintiffs' proposed modification would not fundamentally alter OPWDD's programs.

Finally, Defendant argues that Plaintiffs' ADA and Rehabilitation Act claims should be dismissed because Plaintiffs do not allege that they ever "requested a hearing" regarding C.D.'s involuntary admission on medical certification to Valley Ridge, as provided for by state law. Dkt. No. 41 at 7 (citing N.Y. Mental Hyg. Law § 15.31). The Court declines to consider this argument, which was raised for the first time in Defendant's reply memorandum of law. *See Whittaker v. Univ. Surgical Assocs., LLP*, No. 19-cv-227 (BKS/ATB), 2019 WL 4932829, at *3 (N.D.N.Y. Oct. 7, 2019) ("The law in the Second Circuit is clear that arguments or requests for relief raised for the first time in reply briefs need not be considered.") (citation omitted).

Accordingly, Defendant's motion to dismiss Plaintiffs' ADA and Rehabilitation Act claims is denied.

**E. Equal Protection Claim**

Defendant moves to dismiss Plaintiffs' claim that OPWDD is violating C.D.'s Equal Protection rights, arguing that Plaintiffs have failed to adequately plead a high degree of similarity between C.D. and other New York adults currently residing at JRC under OPWDD funding. Dkt. No. 33-2 at 27-30. Defendants' argument appears to invoke a "class-of-one" Equal Protection theory, which requires an "extremely high" degree of similarity between the plaintiff and a comparator. *See* Dkt. No. 33-2 at 27-30 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Hu v. City of New York*, 927 F.3d 81, 93 (2d Cir. 2019) (discussing *Olech* Equal Protection claims). Defendant further argues that Plaintiffs fail to plead how OPWDD policies are not rationally related to a legitimate governmental purpose. Dkt. No. 33-2 at 30.

In response, Plaintiffs articulate a traditional classification-based theory of their Equal Protection claim: that the New York statutory scheme differentiates between (1) New York adults who are allowed to *remain* at an out-of-state placement under OPWDD funding and (2) similar adults who, once transferred back to New York, are not entitled to the same funding. Dkt. No. 38 at 28 (citing N.Y. Mental Hyg. Law § 13.38). Although Plaintiffs appear to acknowledge that this distinction is subject to the deferential rational basis review, they argue that the distinction is "arbitrary and irrational." *Id.* Defendant does not specifically respond to this argument or articulate a legitimate governmental purpose the distinction Plaintiffs challenge might serve, and the Court declines to speculate.

Accordingly, at this stage, the Court concludes that dismissal of the Equal Protection claim is not warranted.

**F. Requested Relief**

Finally, Defendant moves to dismiss Plaintiffs' requested relief of a preliminary and permanent injunction, generally arguing that the Court has already denied Plaintiffs' request for a

preliminary injunction, "obey the law" injunctions are not available, and Plaintiffs cannot satisfy the requirements for a permanent injunction. Dkt. No. 33-2 at 34-37; *see also* Dkt. No. 41 at 13-14 (arguing that Defendant's motion can be treated in the alternative as a motion to strike under Rule 12(f)). Plaintiffs respond that a motion to dismiss is not a proper vehicle to attack a prayer for relief. Dkt. No. 38 at 31-34.

Generally, a Rule 12(b)(6) motion to dismiss "is addressed to a 'claim'—not to a form of damages." *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 270, 284 (S.D.N.Y. 2024) (citation omitted). Courts in this Circuit have recognized that motions to dismiss "may be directed at prayers for relief where particular damages are unavailable as a matter of law." *Id.* at 284 n.7 (citation omitted); *see, e.g.*, *Wilson v. Better Mortg. Corp.*, 811 F. Supp. 3d 631, 645 (S.D.N.Y. 2025) ("Motions to dismiss are ordinarily not properly directed at species of damages, save where such relief is categorically unavailable."). Here, Defendant does not argue, or provide any authority suggesting, that any of the relief demanded by Plaintiffs in the Verified Amended Complaint is categorically available as a matter of law. Rather, Defendant argues on the merits that Plaintiffs are not entitled to the relief requested.

The Court therefore denies Defendant's request to dismiss or strike Plaintiffs' requested injunctive relief as premature. *See, e.g.*, *Young America's Found. v. Senger*, No. 20-cv-822 (LEK/ML), 2021 WL 3738005, at *14 (N.D.N.Y. Aug. 24, 2021) (declining to address defendants' arguments that plaintiffs were seeking "obey the law" injunctions as "premature at the motion to dismiss stage").

## IV. REQUESTS TO SEAL

Defendant has filed four letter requests to seal certain documents, or portions of documents, filed in connection with Plaintiffs' motion for preliminary injunctive relief and Defendant's motion to dismiss. Dkt. Nos. 20, 23, 34, 42. Defendant asserts that sealing is warranted because the

documents contain "sensitive mental health information" of C.D. Plaintiffs have not opposed or otherwise provided their position on Defendant's sealing requests.

Local Rule 5.3 provides that a "party seeking to have a document, a portion of a document, a party or an entire case sealed bears the burden of filing an application setting forth the reason(s) that the referenced material should be sealed under the governing legal standard." N.D.N.Y. L.R. 5.3(a). Courts in the Second Circuit use a three-step process to determine whether a document may be sealed. *See Lugosch v. Pyramid Corp. of Onondaga Cnty.*, 435 F.3d 110, 119-20 (2d Cir. 2006). First, the court must determine whether the documents are "judicial documents" to which a presumption of access attaches. *Id.* at 119. A "judicial document" is a document which is "relevant to the performance of the judicial function and useful in the judicial process." *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995). Second, if the subject documents are judicial documents, the court must determine the weight of presumption of access. *Lugosch*, 435 F.3d at 119. The presumption of access is stronger when the document at issue involves the adjudication of the litigants' substantive rights. *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995). The presumption weakens "where the filing with the court is unusual or is generally under seal." *Id.* at 1050. Third, the court balances "competing considerations" against the weight of presumption of access. *Lugosch*, 435 F.3d at 120 (citation omitted). Such considerations include "the privacy interests of those resisting disclosure." *Amodeo*, 71 F.3d at 1050-51.

Here, Defendant seeks to seal Dkt. Nos. 19-4 (two Certificates of Examination by Examining Physician or Certified Psychologist) and 19-5 (Application for Non-Objecting or Involuntary Admission to a School). *See* Dkt. No. 20. Defendant also seeks to redact portions of the following documents:

- Dkt. Nos. 11 (Defendant's memorandum of law in opposition to Plaintiffs' motion for preliminary relief), 11-1 (Declaration of Katharine Maunz), 19 (Defendant's

sur-reply in further opposition to Plaintiffs' motion for preliminary relief), 19-1 (Declaration of Jodi Nettleton), and 22-2 (Defendant's memorandum of law in support of withdrawn motion to dismiss). *See* Dkt. No. 23.

- Dkt. No. 33-2 (Defendant's memorandum of law in support of motion to dismiss). *See* Dkt. No. 34.
- Dkt. Nos. 41 (Defendant's reply memorandum of law in support of motion to dismiss), 41-1 (Declaration of Melissa Drabo), 41-2 (Assessment for Suitability for Voluntary Admission Status or Conversion), 41-3 (Application for Voluntary or Minor Voluntary Admission to a School), and 41-4 (OPWDD email to Plaintiffs with attachments). *See* Dkt. No. 42.

Here, with one exception, these documents are judicial documents because they were submitted in opposition to Plaintiffs' motion for preliminary injunctive relief and in support of Defendant's motion to dismiss, and there is a strong presumption of access. *See Vinci Brands LLC v. Coach Servs., Inc.*, No. 23-cv-5138, 2023 WL 6289969, at *1 (S.D.N.Y. Sept. 27, 2023) (concluding that documents submitted in connection with a motion for temporary restraining order and preliminary injunction were judicial documents); *UGX Brands, LLC v. City of Norfolk*, No. 24-cv-5839, 2025 WL 1295056, at *1 (S.D.N.Y. May 5, 2025) (noting that "documents submitted in support of a motion to dismiss are undoubtedly judicial documents relevant to the performance of the judicial function and useful in the judicial process" (citation and internal quotation marks omitted)). The one exception is Dkt. No. 22-2, the memorandum of law Defendant filed in support of a motion to dismiss which was withdrawn after Plaintiffs filed the Verified Amended Complaint. *See* Dkt. Nos. 28, 29. This document is therefore irrelevant to the performance of the judicial function, and Defendant's request to seal portions of Dkt. No. 22-2 is granted.

The Court grants Defendant's request to seal or redact Dkt. Nos. 19-4, 19-5, 41-2, 41-3, and 41-4. These documents contain sensitive mental health information and are akin to medical records, which courts in this Circuit routinely seal. *See, e.g.*, *Anthony M. v. Wright*, No. 07-cv-

6040, 2018 WL 5619832, at *2 (W.D.N.Y. Oct. 30, 2018) ("[C]ourts in this Circuit routinely seal medical records . . . to protect the plaintiff's privacy interest in those records.") (citations omitted).

On the other hand, the proposed redactions for the remaining documents, Dkt. Nos. 11, 11-1, 19, 19-1, 33-2, 41, and 41-1, are overbroad. Although Defendant may redact information which truly constitutes sensitive medical information, Defendant may not redact key facts that go to the very nature of this case, including that the fact that C.D. was evaluated and recommended for involuntary confinement, that C.D. was and is presently in an institutional placement, and that C.D.'s status subsequently changed to "voluntary." Any privacy interest C.D. or the Plaintiffs have in these facts does not outweigh the presumption of access to such matters which are at the heart of the present controversy.[10] Further, in any renewed request to seal Defendant should omit redactions of matters which do not specifically pertain to C.D.'s medical history and which state legal principles. *See, e.g.*, Dkt. No. 11-1 ¶ 15 (describing the Wildwood School); Dkt. No. 41-1 ¶ 4 (describing Mental Hygiene Law § 15.31). Defendant's requests to redact, Dkt. Nos. 11, 11-1, 19, 19-1, 33-2, 41, and 41-1, are therefore denied without prejudice.

## V. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion to dismiss, Dkt. No. 33, is **GRANTED in part and DENIED in part**; and it is further

**ORDERED** that Plaintiffs' Section 1983 claim for violation of the Fourteenth Amendment's Due Process Clause (fourth claim for relief) is **DISMISSED without prejudice**; and it is further

[10] The Court notes that these facts are present in the Verified Amended Complaint and Plaintiffs' briefing on the motion to dismiss.

**ORDERED** that any requests for purely retrospective declaratory relief are barred by the Eleventh Amendment and the doctrine of sovereign immunity; and it is further

**ORDERED** that Defendant's motion to dismiss is otherwise **DENIED**; and it is further

**ORDERED** that Defendant's request to seal, Dkt. No. 20, is **GRANTED**; and it is further

**ORDERED** that Defendant's request to seal, Dkt. No. 23, is **GRANTED** in part to the extent that Dkt. No. 22-2 may be sealed but otherwise **DENIED** without prejudice; and it is further

**ORDERED** that Defendant's request to seal, Dkt. No. 34, is **DENIED** without prejudice; and it is further

**ORDERED** that Defendant's request to seal, Dkt. No. 42, is **GRANTED** in part to the extent that Dkt. Nos. 41-2, 41-3, and 41-4 may be redacted but otherwise **DENIED** without prejudice; and it is further

**ORDERED** that the Clerk of Court is directed to upload the redacted version of Dkt. No. 22-2 to the docket; and it is further

**ORDERED** that any renewed request to seal must be made by October 20, 2026.

**IT IS SO ORDERED.**

Dated: September 18, 2026

Elizabeth C. Coombe
U.S. District Judge